**Thomas Lee HOOKER, Appellant,**

v.

**STATE of Indiana, Appellee.**

No. 1–578A108.

Court of Appeals of Indiana, First District.

April 23, 1979.

Rehearing Denied May 31, 1979.

John G. Bunner, Evansville, for appellant.

Theodore L. Sendak, Atty. Gen., Terry G. Duga, Deputy Atty. Gen., Indianapolis, for appellee.

LYBROOK, Presiding Judge.

Defendant-appellant Thomas Lee Hooker was found guilty of voluntary manslaughter by a jury in the shooting death of his brother, Moses, and sentenced to be imprisoned for not less than two nor more than 21 years.

His appeal raises three issues for our review:

(1) Whether the trial court erred in overruling Hooker's motion to suppress a confession he made to police;

(2) Whether the trial court erred in re-reading the confession to the jury during deliberations and upon the jury's request; and

(3) Whether the trial court erred in giving State's instruction No. 8.

We affirm.

### Issue I.

Hooker argues his confession was not voluntarily given under the guidelines of *Miranda v. Arizona* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, because he is illiterate and lacks sufficient mental comprehension to understand the rights he waived and to know the consequences of his making a statement to police officers.

The record shows that Moses Hooker was shot at the residence he shared with the defendant between 12:30 and 1:00 a. m. on July 20, 1977. The defendant was taken to a police station where he signed a waiver of rights form at 2:40 a. m. At 5:15 a. m., he signed a typewritten record of a statement he made to the police. The trial court denied Hooker's motion to suppress the statement at trial.

Hooker signed the printed waiver form and made his statement without having an attorney present. As this court said in *Bauer v. State* (1973) 157 Ind.App. 400, 405, 300 N.E.2d 364:

"When this occurred, a heavy burden rested on the State to demonstrate that [the defendant] knowingly and intelligently waived his privilege against self-incrimination and his right to counsel. *Dickerson v. State* (1972), 257 Ind. 562, 276 N.E.2d 845; *Escobedo v. Illinois* (1964), 378 U.S. 478, 490, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977. A printed waiver form signed by [the defendant] is not conclusive. *Dickerson v. State, supra.*

The crucial test of the *Miranda* warning was set forth in *Coyote v. United States, supra,* 380 F.2d [305, 10th Cir.] at 308:

'. . . What *Miranda* does require is meaningful advice to the unlettered and

unlearned in language which he can comprehend and on which he can knowingly act. We will not indulge semantical debates between counsel over the particular words used to inform an individual of his rights. *The crucial test is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear, understandable warning of all of his rights.'* (Our emphasis.)"

The evidence at the hearing on Hooker's motion to suppress showed that Hooker went to the fifth grade in school, was functionally illiterate, could not read, could not write, could print only his name, did not know his age or birthdate, had no concept of time, and did not know the current month.

Two experts who testified at the suppression hearing offered conflicting views as to whether Hooker was mentally competent to appreciate the significance of waiving his *Miranda* rights and giving a statement to the police. One expert examined Hooker's statement to the police and, on that basis, estimated his intelligence quotient in the range of 80 or below normal. He testified that he believed that Hooker could understand the language of State's Exhibit No. 47, the Evansville Police Department Statement of *Miranda* Rights and Waiver of Rights, if the contents were read aloud to him in a "slow friendly manner" without the aid of further explanation.

The second expert testified that an oral, standardized intelligence test placed Hooker's intelligence quotient at 45. He said that a person with an I.Q. in the mid-50's was "educable" and that he considered Hooker to be "educable" because he had been able to earn a living and had no prior serious problems with the law. This expert first testified that, in his opinion, Hooker could understand the forms if they were read aloud to him and "a very strong effort was made to go through it step-by-step and laboriously explain the meaning of each of the *Miranda* rights." He later hedged this testimony somewhat: "I don't think . . that unless every step of this *Miranda*

Rights was very carefully and very elaborately explained to him that he could understand it," and "If it was a very very considered effort, it might be that he could understand it, yet, I somehow don't feel that he could fully understand it." He found Hooker to be "tractable" in that he could probably be easily led into answering certain questions a certain way.

Policeman Richard Tenbarge testified that he participated, along with other officers, in securing Hooker's waiver and his statement. Tenbarge said that Exhibit No. 47 was read to Hooker twice, once by another officer and once by Tenbarge. Tenbarge also said, ". . . then the rights were ad-libbed on to a degree." When asked to explain precisely what he meant by "ad-libbed on to a degree", Tenbarge explained:

"It was stated to him that he had the right to remain silent and this meant that he didn't have to talk to us; that anything he did tell us could and would be used against him in a Court; and that he had the right to talk to a lawyer or attorney and that he had the right to have one present during the questioning and that if he couldn't afford a lawyer, that the State would hire or appoint him a lawyer and that he could stop talking to us at any time or he could ask for an attorney at any time that he wanted to."

Further testimony from Tenbarge was, in part, as follows:

"Q. After the rights were explained to Mr. Hooker, what did he do or say?

A. He, you know, agreed to talk to us and to give us a statement.

\* \* \* \* \* \*

Q. When you said you have the right to remain silent, what did he say?

A. He just really didn't say anything. When I asked him if he understood his rights, he said yes.

Q. Did he say anything when you said anything you say can and will be used against you in a Court of Law?

A. He really didn't make any particular response.

Q. Alright. You have the right to talk to a lawyer and have him present with you while you are being questioned. What did he say about that?

A. He made no particular response.

Q. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish.

A. He made no particular response.

Q. Did you explain to him that if he didn't have any money how or who would appoint a lawyer to represent him?

A. Yes.

Q. What did you tell him?

A. I told him there were several different possibilities. I said that generally in a case like this the Vanderburgh County Superior Court Misdemeanor Section would appoint him an attorney.

Q. When would they appoint that attorney?

A. That appointment would be the next day when he appeared in Court. And prior to that, if he wanted an attorney, we would contact the Prosecutor's Office.

Q. And you can decide at any time to exercise these rights and not answer any questions or make any statements. Did he make any comment with regard to that?

A. No particular comment."

Tenbarge testified that he believed that Hooker understood his rights and knew that his statement could well be used against him in court.

Justice DeBruler set forth these applicable rules for our review in *Ortiz v. State* (1976) 265 Ind. 549, 356 N.E.2d 1188 at 1191:

"In determining whether a statement was voluntarily given, we look to all the circumstances surrounding its giving to determine whether it was 'induced by any violence, threats, promises, or other improper influence.' *Montes v. State* (1975) Ind., 332 N.E.2d 786, 792. The same test determines whether a waiver of the *Mi-*

*randa* rights has occurred. *Nacoff v. State* (1971) 256 Ind. 97, 267 N.E.2d 165. The burden is on the State to prove beyond a reasonable doubt the voluntariness of the statement or waiver. *Burton v. State* (1973) 260 Ind. 94, 292 N.E.2d 790. In reviewing the trial court's ruling on the voluntariness of a statement or waiver, we do not weigh the evidence, but determine whether there is sufficient evidence to support the trial court's finding. *Raines v. State* (1971) 256 Ind. 404, 269 N.E.2d 378."

■ The defendant did not testify at the motion hearing so Tenbarge's testimony is uncontradicted. One expert said that reading the language of the forms aloud would have been sufficient, and Tenbarge said this was done twice. The other expert said that the language of the forms would have to have been accompanied by further oral explanation, and Tenbarge said this was done. The conflict in the testimony of the two experts is not dispositive because a reviewing court will not disturb a ruling by the trial court as to the admissibility of a confession when it is based upon conflicting evidence, except for an abuse of discretion. *Drake v. State* (1977) Ind.App., 369 N.E.2d 941.

■ Under the *Ortiz* rule, we must conclude that there is sufficient evidence to support the trial court's ruling that Hooker knowingly and intelligently waived his right to remain silent and his right to have an attorney present during questioning.

### Issue II.

■ During deliberations, the bailiff received a note from the jury foreman asking for Hooker's statement to the police, State's Exhibit No. 48. The jury was returned to the courtroom and the foreman explained to the court that the request was being made because of disagreement among the jurors. The judge reread Hooker's statement to the jury and Hooker alleges this was error. This precise issue was laid to rest in *Ortiz, supra,* 356 N.E.2d at 1197:

"After the jury retired to deliberate, its members sent a note to the court requesting the re-reading of Williams' statement. The court called the jury back into the courtroom and read the edited statement.

. . . . .

Indiana Code § 34–1–21–6 (Burns 1973) provides in relevant part:

'After the jury has retired for deliberation, if there is a disagreement between them as to any part of the testimony . . . they may request the officer to conduct them into court, where the information required shall be given . . .'

We construe this statute to provide that the judge must, on the jury's request, have read to them any properly admitted testimony or documentary evidence. This holding is compatible with the A.B.A.'s *Standards for Criminal Justice, Trial by Jury*, § 5.2(a) at p. 134 (Approved Draft 1968), the comments to which note that this is the usual practice. *Id.* at pp. 134–36. There was no error in rereading Williams' statement."

Consequently, there was no error in the case at bar.

### Issue III.

 Defendant's final allegation of error is addressed to the court's giving of State's tendered instruction No. 8 as follows:

"The Court further instructs you that the condition of mind which usually and immediately follows the excessive use of alcoholic liquors is not, in and of itself, the unsoundness of mind meant by our law. Mere voluntary drunkenness or intoxication does not excuse the crimes of second degree murder, voluntary and/or involuntary manslaughter, and a defend-

ant cannot escape punishment for the crimes on the gound [sic] that he did an alleged unlawful act while drunk; and such drunkness [sic] and/or intoxication does not lessen or abate the severity of punishment prescribed by law. In other words, mere voluntary drunkenness or intoxication is no excuse for those crimes."

Hooker argued at trial and to this court that the instruction is not a proper statement of the law because it indicates to the jury that specific intent is not an element of the offense of voluntary manslaughter.[1]

We first note that, except for the specific reference to the crimes of second-degree murder, voluntary manslaughter and involuntary manslaughter, and the omission of a final phrase, this instruction is in all other respects like the one approved by our Supreme Court in *Wilson v. State* (1970) 253 Ind. 585, 255 N.E.2d 817, as follows:

"The Court further instructs you that the condition of mind which usually and immediately follows the excessive use of alcoholic liquors is not, in and of itself, the unsoundness of mind meant by our law. Mere voluntary drunkenness or intoxication does not excuse crime and a defendant cannot escape punishment for a crime on the ground that he did an alleged unlawful act while drunk: and such drunkenness and/or intoxication does not lessen or abate the severity of punishment prescribed by law.

In other words, mere voluntary drunkenness or intoxication is no excuse for crime, nor does it in any degree mitigate or palliate an offense actually committed."

The omission of the phrase "nor does it in any degree mitigate or palliate an offense actually committed" would have worked to Hooker's advantage, if anything, because it seemingly lessens the severity of the in-

---

1. Specific intent is present when from the circumstances the offender must have subjectively desired the prohibited result. General criminal intent exists when from the circumstances the prohibited result may reasonably be expected to follow from the offender's voluntary act, irrespective of a subjective desire to have accomplished such result. 22 C.J.S. *Criminal*

*Law* §§ 32 and 35 (1961). This distinction, germane to a discussion of voluntary manslaughter under Ind.Code 35–13–4–2, since repealed, will no longer be relevant under the 1977 Indiana Penal Code which codifies the degrees of *mens rea*, or mental intent, required for the commission of a crime. Ind.Code 35–41–2–2.

struction's restrictions on the use of evidence of intoxication. We are left then with the question of whether the enumeration of the three specific crimes makes what otherwise is a correct statement of the law an erroneous one.

 In relation to the evidence presented as to Hooker's possible intoxication at the time of the shooting of his brother, the court also gave its own final instruction No. 29 as follows:

"Temporary mental incapacity, as a result of being under the influence of alcohol furnishes no legal excuse for the commission of a crime.

However, such incapacity may produce a state of mind which prevents the defendant from being able to form a specific intent which you must find before you can convict the defendant of First Degree Murder. If the defendant was suffering from temporary mental incapacity, as a result of being under the influence of alcohol, so that he could not at the time form the necessary specific intent, then he would not be guilty of First Degree Murder.

Any intoxication, not necessarily total, may be considered on the question of specific intent.

The term 'intoxication' means a condition resulting from the drinking of alcoholic beverages which impair a person's normal faculties—either of perception or will of judgment—so that he no longer has the capacity to form a specific intent to commit such an act.

It is for you to determine the extent of the defendant's intoxication, and whether it operated to prevent his forming the specific intent necessary to constitute the crime."

This instruction is, of course, a correct statement of the law. *James v. State* (1976) 265 Ind. 384, 354 N.E.2d 236. We agree with the defendant that the import of the two instructions on intoxication, when read together, is that the offense of first-degree murder requires the State to prove specific intent, an element which could be negated by sufficient evidence of intoxica-tion, while the offense of voluntary manslaughter does not require proof of specific intent and thus could not be negated by such evidence. We do not agree with Hooker, however, that this is an erroneous conception of the law.

It is true that earlier cases held that an intention to kill is a necessary element of the offense of voluntary manslaughter. *Ketring v. State* (1936) 209 Ind. 618, 200 N.E. 212; *King v. State* (1918) 187 Ind. 220, 118 N.E. 809. No case has clearly held, however, that this is a requirement of a showing of specific intent. In fact, *Hill v. State* (1937) 212 Ind. 692, 11 N.E.2d 141, found erroneous an instruction stating that the only difference between voluntary manslaughter and involuntary manslaughter is that in voluntary manslaughter the actor must intend to kill his victim, and in involuntary manslaughter there need not be any intention to take life. The *Hill* court said, at 698, 11 N.E.2d at 144, "This is not a clear distinction between the two classes of manslaughter and should not have been given." In *Brattain v. State* (1945) 223 Ind. 489, 61 N.E.2d 462, the Supreme Court, without distinguishing between voluntary and involuntary manslaughter, stated that no specific intent is required in order to support a finding of guilty of manslaughter.

While not specifically holding that specific intent is or is not an element of the offense of voluntary manslaughter, the Supreme Court has held that second-degree murder under Ind.Code 35–1–54–1, since repealed, is not a crime of specific intent. *Wilson v. State* (1978) Ind., 374 N.E.2d 45; *Kriete v. State* (1975) 263 Ind. 381, 332 N.E.2d 209. A comparison of the language of the statutes which define these offenses is helpful.

Ind.Code 35–1–54–1 reads, in part, as follows:

"Whoever, purposely and maliciously, but without premeditation, kills any human being, is guilty of murder in the second degree . . . ."

Ind.Code 35–13–4–2 reads, in part, as follows:

"Whoever voluntarily kills any human being without malice, expressed or implied, in a sudden heat, is guilty of voluntary manslaughter . . . ."

The key terms which must be compared relevant to the required levels of *mens rea* are "purposely" in reference to second-degree murder and "voluntarily" in reference to voluntary manslaughter. Our courts have given these definitions:

Purposely: "intentionally or designedly", *Eaton v. State* (1904) 162 Ind. 554, 70 N.E. 814.

Voluntarily: "by the free exercise of the will, done by design, purposely", *Neff v. State* (1978) Ind.App., 379 N.E.2d 473; *Murphy v. State* (1869) 31 Ind. 511.

Black's Law Dictionary (rev. 4th ed. 1968) at 1400 defines "purposely" to mean "intentionally, designedly, consciously, knowingly". Black's at 1746 defines "voluntary" to mean "unconstrained by interference, unimpelled by another's influence, spontaneous, acting of oneself, done by design or intention, purpose, intended."

22 C.J.S. *Criminal Law* § 29 (1961) says that all crimes of which intent is a necessary element must be "voluntary", that is they "must proceed from the will, from a mind free to act, and it is in that sense that a criminal act may be properly said to be done with design, purpose, or intent."

That the Supreme Court has not dispositively laid to rest the issue at hand is shown by *Williams v. State* (1969) 252 Ind. 154, 246 N.E.2d 762, wherein the court accepts *for the sake of argument only* the appellant's assertion that actual intent to kill is a necessary element of voluntary manslaughter.

Given the legislature's choice of voluntariness as an element of the offense of voluntary manslaughter, and the Supreme Court's interpretation of the level of intent denoted by the word "purposely" in the second-degree murder statute, we do not believe the legislature intended voluntary manslaughter to be a specific intent offense. We hold that specific intent is not an element of voluntary manslaughter under Ind.Code 35–13–4–2. Consequently, the jury was not misled by the challenged instruction.

Affirmed.

LOWDERMILK and ROBERTSON, JJ., concur.