Robert L. JACKSON, Petitioner,

v.

Jack R. DUCKWORTH, Warden, and the
Indiana Attorney General,
Respondents.

No. S81–431.

United States District Court,
N.D. Indiana,
South Bend Division.

Oct. 28, 1982.

Robert L. Jackson, pro se.

Bruce L. Kamplain, Deputy Atty. Gen., Linley Pearson, Atty. Gen., Indianapolis, Ind., for respondent.

## MEMORANDUM AND ORDER

SHARP, Chief Judge.

This case is presently before the Court on a petition for writ of habeas corpus, filed under 28 U.S.C. § 2254. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, this memorandum of decision and order constitutes this Court's findings of fact and conclusions of law.

The petitioner, Robert L. Jackson, is an inmate at the Indiana State Prison at Michigan City, Indiana, where he is currently serving a sentence of life imprisonment for second-degree murder. Petitioner's conviction by a jury in state court was unanimously affirmed on appeal by the Supreme Court of the State of Indiana on March 31, 1980. *See Jackson v. State,* Ind., 402 N.E.2d 947 (1980). Petitioner raised four issues on his direct appeal in the state courts, and now raises those same four issues in this application for a writ of habeas corpus. Each of these issues will be addressed in its turn.

■ As his first ground for seeking habeas relief in this Court, petitioner contends that there was insufficient evidence presented at his trial to sustain a verdict of guilty, arguing that he was not mentally responsible for his actions. Where questions relating to the sufficiency of evidence are raised in a federal habeas petition, the standard to which the federal habeas court is to adhere is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). Thus, the role of the federal court in a habeas proceeding is not to reweigh the evidence as a *de novo* trier of fact, but rather to review the evidence presented in a light most favorable to the prosecution. *Id.* Bearing this standard in mind, this Court now turns to a recitation of the salient facts in this case.

■ Mrs. Jeannie Jackson, the mother of the petitioner, testified at trial that, on the date in question, September 18, 1977, she, the petitioner, three of her other children, two grandchildren, and the victim, Richard Johnson, all lived at 119 Elsworth Street in Gary, Indiana. *Record,* 108–109. Mrs. Jackson related that, on the morning of September 18, 1977, the petitioner awakened her and told her that the basement of the residence was flooded with fuel oil. *Record,* 110. The basement was in fact wet with rain water. *Id.* Noting that the petitioner "was acting stranger than he had been," Mrs. Jackson went next door to her sister's apartment to telephone for a doctor. *Id.* While she was waiting for the doctor to return her call, the decedent, Richard Johnson, telephoned to say that he was going outside to the filling station for cigarettes and asked whether Mrs. Jackson wanted any. *Record,* 112. While Mrs. Jackson was standing on her sister's porch, she heard a scuffle from inside her own apartment. *Record,* 113. Almost immediately, Mrs. Jackson's eldest daughter, Debra, ran out of

the apartment and told Mrs. Jackson that Mr. Johnson was lying on the floor. *Id.* The petitioner then emerged from the apartment with a hammer in his hand and entered the Gates' apartment, i.e., Mrs. Jackson's sister's apartment. *Id.* Mrs. Jackson and her sister, Mrs. Gates, easily took the hammer away from petitioner. *Record,* 113–14. Mrs. Jackson then hid the hammer under a pillow until the police arrived, when she turned it over to them. *Record,* 114.

Mrs. Jackson testified that the petitioner asked, "Where is Thomas?," i.e., Mr. Gates, as he entered the Gates' apartment with the hammer still in hand. *Record,* 115–16. At that time, Thomas Gates was on the telephone with the police, attempting to summon an ambulance as well. *Record,* 116. Upon being warned by Mrs. Jackson and Mrs. Gates to flee, Mr. Gates left the apartment. *Record,* 116–18. Mrs. Jackson stated that Mr. Johnson had been "doing fine" that morning, and that he and the petitioner had always gotten along well together. *Record,* 118–19.

Mrs. Jackson further testified that the petitioner's personality had undergone a dramatic change in the week prior to Johnson's killing. *Record,* 119. Because of the petitioner's strange behavior, Mrs. Jackson took him to a clinic where he was given a "horse pill" and an injection, after which he was sent home. *Record,* 123. Once at home, the petitioner remained there with his mother the rest of that week. *Id.*

On the Saturday prior to the killing, Mrs. Jackson had the petitioner admitted to Mercy Hospital. *Record,* 123–24. However, Mrs. Jackson testified that she withdrew her son from Mercy Hospital at the request of her physician, and attempted to have the petitioner admitted to Methodist Hospital. *Record,* 124. Apparently because of the inability of the hospital's staff to locate her physician, Mrs. Jackson gave up trying to have her son admitted to Methodist Hospital and took him home at approximately 10:00 p.m. *Record,* 124–26. Mrs. Jackson further noted that the petitioner had been afraid to eat anything that entire day, and because of his failure to sleep the night before, she gave him a sleeping pill. *Record,* 126–27.

It was Mrs. Jackson's testimony that the petitioner had never held a job for any consequential period of time, because he would be discharged either for fighting or for sleeping on the job. *Record,* 129–33. She further stated that she had been warned by the petitioner's aunt, Mrs. Gates, that the petitioner was having difficulties at his place of employment. *Record,* 133–35.

On cross-examination, Mrs. Jackson claimed that the petitioner had received no medication or treatment of any kind at the clinic where she had first taken him on the Monday before the killing. *Record,* 167–68. Instead, she admitted that the petitioner had had to be placed under restraint by the Gary Police Department and removed to Methodist Hospital, where he was given medication to calm him. *Record,* 168. Later, he was given additional medication by his own physician for a back injury. *Record,* 170–71.

The next individual to testify was Dr. I.K. Somani, a pathologist at Methodist Hospitals in Gary and Merrillville, Indiana. He stated that his autopsy of the body of the victim, Richard Johnson, revealed that Johnson had died from contusions of the brain and scalp fractures. *Record,* 143.

Mrs. Carnethia Gates, the petitioner's aunt, next testified that her sister and petitioner's mother, Mrs. Jackson, had come over to Mrs. Gates' apartment to use the telephone, because the petitioner did not want his mother to use her own telephone. *Record,* 196–98. Mrs. Gates stated that the petitioner had told her to move out of her own apartment, because he believed that her husband, Mr. Gates, intended to kill her. *Record,* 198–99. She further testified that the petitioner had not wished to talk with her in the presence of Johnson. *Record,* 199. After Johnson's murder, the petitioner sat alone with Mrs. Gates, hugging her, until the police arrived, whereupon he fled to the bathroom. *Record,* 201–202. Mrs. Gates also stated that the petitioner had

undergone an abrupt personality change in the week prior to the killing, but that she had never known him to use "street drugs." *Record,* 202–207; 209–10.

Debra Jackson, the petitioner's sister, testified that, on the morning of September 18, 1977, the petitioner had been acting worse than he had been in the previous week. *Record,* 232–33. She stated that the petitioner had been standing on the steps by himself, saying "Die," then he grabbed Debra by the throat in an apparent attempt to protect her from some imaginary threat. *Record,* 233–34. Debra further testified that the petitioner had been pacing to and fro earlier, while constantly licking his lips. *Record,* 241; 247–48. Debra stated that she heard sounds of the scuffle coming from her apartment, and observed the petitioner standing in the doorway with a hammer in his hand and Richard Johnson lying on the floor. *Record,* 236–37. The petitioner reportedly said to her, "He ain't going to bother you no more, Debbie." *Record,* 237. It was Debra Jackson's testimony that she had never known the petitioner to use "street drugs." *Record,* 238–40.

Thomas Gates, the petitioner's uncle by marriage, testified next, generally confirming earlier testimony as to what transpired on the morning of September 18, 1977, including the fact that the petitioner had begun to act strangely the week prior to the killing. *Record,* 250–61.

Officer Petritus of the Gary Police Department testified that, on the morning of September 18, 1977, he had observed the victim, Richard Johnson, lying on the floor, the decedent's head next to the door and his feet toward the interior of the apartment. *Record,* 270–71. Officer Petritus related that the victim's head lay in a pool of blood, that there were several lacerations to the forehead, but that he was still breathing and had a faint pulse. *Record,* 271.

Dr. Frank Hogle, a forensic psychiatrist, was then called by the Court to testify. Dr. Hogle's testimony as to the mental state of the petitioner was that

Mr. Jackson on that date was suffering from an acute paranoid schizophrenic

mental illness and lacked substantial capacity to either appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

*Record,* 288. However, Dr. Hogle further testified that the petitioner had admitted to drinking quite heavily and to having had a "bad trip" on L.S.D. *Record,* 299–301. Dr. Hogle also stated that certain drugs, including L.S.D., could cause symptoms similar to those of schizophrenia. *Record,* 302.

Dr. George A. Batacan, a second psychiatrist called to testify by the court, agreed with Dr. Hogle that

the defendant [petitioner] was not responsible for his criminal conduct at the time of the commission of the crime because he was suffering from a form of mental disease that substantially reduces his capacity to appreciate the wrongfulness of his conduct and to conform his conduct according to the requirements of law.

*Record,* 393. Dr. Batacan went on to testify that the mental disease from which the petitioner was suffering was a "form of brain damage organic brain syndrome induced by substance abuse." *Record,* 393–94. Dr. Batacan also stated that the petitioner had himself admitted to ingesting L.S.D., P.C.P., T.H.C., and alcoholic beverages since the age of sixteen. *Record,* 396–97.

Finally, Dr. Bennie Carpenter, a physician and surgeon, was called by the defense. Dr. Carpenter testified that, in his opinion, the petitioner had been insane at the time of the commission of the crime and that his insanity was the result of a paranoid state which had existed for years. *Record,* 445–46.

Applying the standard set forth in *Jackson v. Virginia, supra,* to the facts of this case requires that explicit reference be made to the substantive elements of the offense as defined by state law. *Id.,* at 324, n. 16, 99 S.Ct. at 2792, n. 16. Addressing that question, the Supreme Court of the State of Indiana said:

It was the conclusion of all three psychiatrists that defendant was not responsible for his conduct by virtue of his mental state; nevertheless, a jury could have concluded from the testimony of Dr. Batacan that defendant's bizarre conduct was a direct result of recent concomitant intoxication caused by the voluntary ingestion of "street drugs." As we emphasized in *Hill v. State,* (1969) 252 Ind. 601, 615–616, 251 N.E.2d 429, a jury is not bound by the definitions of conclusions of the experts on such matters. "They need not be influenced by the use of specific labels, but rather must determine for themselves, whether the defendant's disability was such as to excuse him from criminal responsibility." *Id.* at 616, 251 N.E.2d 438. Temporary mental incapacity, when induced by voluntary intoxication, normally furnishes no legal excuse for, or defense to, a crime. *Fisher v. State,* (1878) 64 Ind. 435; *Hooker v. State,* (1979) Ind.App., 387 N.E.2d 1354. *See also,* 22 C.J.S. Criminal Laws §§ 70, 72, (1961). However, there are exceptions to the above-stated rule. Where the ingestion of intoxicants, though voluntary, has been abused to the point that it has produced mental disease such that the accused is unable to appreciate the wrongfulness of his conduct or is unable to conform his conduct to the requirements of the law, the law does not hold him responsible for his acts. *Fisher v. State, supra.** It is for the jury to determine whether the accused's conduct was the result of a diseased mind—regardless of the source of the disease—or was the result of voluntary intoxication

*Jackson v. State,* at 949. Based on the above, and construing the facts as presented in light of *Jackson v. Virginia, supra,* this Court concludes that the record reveals sufficient evidence upon which to support the verdict of guilty.

Petitioner raises as his second line of argument the contention that the state trial court violated his constitutional rights to due process by giving Final Instruction Number 9 to the jury over defense counsel's objection. The instruction reads, in its entirety:

The jury is not bound by the definitions or conclusions of experts who have testified as to what is a mental disease or mental defect. Mental disease or mental defect includes any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls. Thus the jury is instructed to consider expert testimony in light of all other testimony presented concerning the development, adaptation and functioning of his mental and emotional processes and behavior controls and not necessarily accept the ultimate conclusions of the experts as to the defendant's legal sanity or insanity. This is your decision and only your decision. You must decide the extent of the defendant's mental disability, if any.

Mental disability may be based on the use or abuse of alcohol or other drugs even though intoxication is not a defense to a crime. A defendant charged with a crime who was voluntarily under the influence of any drug at the time of the commission of that crime may not raise that fact as a defense. However, intoxication from alcohol or other drugs may be so extreme that a person is either incapable of forming or entertaining a malicious purpose to kill. It is this mental capability you must examine. If the act charged was committed while his inhibitions were loosened or removed by the use of drugs or alcohol and in a state of intoxication, it is not a defense. If the act charged was committed while his mind was damaged or altered so that he was acting while in a state of psychosis, then brain damage or brain alteration may be so great that it amounts to insanity.

The burden of proving insanity is not on the defendant, however. The burden is on the state to prove to you beyond a reasonable doubt that at the time of the commission of the acts charged the defendant had sufficient mental ability to be criminally responsible for his acts. *Record,* 47.

Petitioner argues that the state trial court's repetition of the phrase "intoxica-

tion is not a defense to a crime" unfairly represented to the jury a duty on the defendant-petitioner to prove that he was not intoxicated in order to avail himself of the insanity defense.

■ As noted by the Supreme Court of the State of Indiana, the instruction did state three times that voluntary intoxication is not a defense. *Jackson v. State,* at 950. However, each such statement was counterbalanced with another statement explaining that a finding of insanity may be based upon extreme or long-term abuse of narcotics or alcohol, irrespective of whether voluntarily or involuntarily ingested. The Supreme Court held that "[t]he instruction does not "cast suspicion" on his insanity defense, either in fact or within the meaning of *Brannum v. State,* (1977) 267 Ind. 51, 366 N.E.2d 1180." *Id.* This Court notes in agreement with the Supreme Court of the State of Indiana that the instruction correctly and fairly states the law of Indiana on the matter of the insanity defense as it relates to intoxication.

■ Petitioner further argues that the instruction should have omitted all reference to "voluntary intoxication." The argument is unpersuasive for the reason that the crucial issue in the prosecution was whether petitioner's actions were the result of voluntary intoxication or of a diseased mind. That fact, coupled with the fact that the instruction correctly and fairly stated the Indiana law on the subject of insanity as a defense, leads to the conclusion that there was no impropriety in the instruction's inclusion of the phrase "voluntary intoxication."

■ Additionally, petitioner argues that the instruction is "confusing and compound." The argument merely states the obvious. The realm of the insanity defense is indisputably a complicated and complex one; however, the instruction constitutes a fairly succinct and balanced explanation of the law of the insanity defense, and most clearly states that the burden of proof is on the prosecution, not the defense.

■ Finally, petitioner argues that the state trial court erred by refusing to give the following instruction proffered by the defense:

> Mental disease or defect may arise from the use or abuse of alcohol and other drugs where such usage results in a condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls.

*Record,* 60. Final Instruction Number 9 contains the following:

> *Mental disability may be based on the use or abuse of alcohol or other drugs even though intoxication is not a defense to a crime. * * * However, intoxication from alcohol or other drugs may be so extreme that a person is either incapable of forming or entertaining a malicious purpose to kill. * * * If the act charged was committed while his mind was damaged or altered so that he was acting while in a state of psychosis, then brain damage or brain alteration may be so great that it amounts to insanity.*

*Record,* 47 (emphasis added). This Court notes that the gist of defense's proffered instruction was incorporated into Final Instruction Number 9; therefore, petitioner cannot seriously maintain that error exists in the trial court's refusal to give the defense's proposed instruction number 4, and this Court declines to so hold.

■ When reviewing questions of alleged constitutional error arising from the giving of jury instructions, it should be borne in mind that such issues are usually deemed to be matters of state law and state concern, and therefore are not properly the subject of federal habeas review. *Henderson v. Kibbe,* 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977). Thus, "[b]efore a federal court may overturn a conviction resulting from a state trial, it must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). It is only where the

reading of an instruction is so prejudicial as to constitute a denial of fundamental fairness and due process that a habeas claim arises. *Henderson v. Kibbe, supra; Jacks v. Duckworth,* 486 F.Supp. 1366 (N.D.Ind. 1980), *aff'd,* 651 F.2d 480 (7th Cir.1981). As the Supreme Court of the United States held in *Henderson v. Kibbe, supra,*

> The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The question in such a collateral proceeding is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violated due process,' *Cupp v. Naughten,* 414 U.S., at 147, 94 S.Ct., at 400, 38 L.Ed.2d 368, not merely whether 'the instruction is undesirable, erroneous or even "universally condemned." '

*Id.,* 431 U.S. at 146, 97 S.Ct. at 1732. A careful review of the record on this issue reveals that the giving of Final Instruction Number 9, being a correct statement of Indiana law on the subject of the insanity defense, and the refusal to give the defense's tendered instruction, do not rise to the level of a violation of the petitioner's constitutional right to due process.

█ As his third argument, petitioner contends that there was an improper admission of testimonial evidence at his trial. As noted above, Dr. Frank Hogle testified that, in his opinion, the petitioner had been insane at the time of the commission of the crime. Dr. Hogle based this conclusion in part on records indicating that petitioner had been upset by the early death of his natural father. *Record,* 310–12. On cross-examination, Dr. Hogle was asked whether he knew that petitioner had told a Dr. Constan that he, the petitioner, had never known his natural father. *Record,* 311. Defense counsel objected to the question, arguing that the subject matter raised by the question was inadmissible hearsay. However, it should be pointed out that petitioner's mother had testified earlier that the petitioner had never known his biologi-

cal father. *Record,* 150–51. Thus, the failure of the trial court judge to sustain defense counsel's objection would constitute, at worst, harmless error.

█ Ordinarily, the rulings by a state trial court on the admissibility of evidence are not to be questioned in a federal habeas proceeding. *Margoles v. United States,* 407 F.2d 727 (7th Cir.1969), *cert. denied,* 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84. The standard to be applied when questions regarding the propriety of state court rulings on the admissibility of evidence arise is whether the admission acted to render the trial so fundamentally unfair that the improper ruling rises to the level of an unconstitutional denial of due process. *Brinlee v. Crisp,* 608 F.2d 839 (10th Cir.1979), *cert. denied,* 444 U.S. 1047, 100 S.Ct. 737, 62 L.Ed.2d 733; *Davis v. Campbell,* 608 F.2d 317 (8th Cir.1979). Thus, an allegation that the state trial court admitted unreliable testimony does not raise any due process issues of constitutional magnitude in a federal habeas proceeding. *Nelson v. Moriarty,* 484 F.2d 1034 (1st Cir.1973). This is generally true, even where hearsay is involved. *Guzzardo v. Bengston,* 643 F.2d 1300 (7th Cir.1981), *cert. denied,* 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955. Because of the fact that petitioner's mother had already testified to the effect that the petitioner had never known his biological father, and in light of the standard of review outlined above, this Court declines to hold that the admission of the hearsay testimony of Dr. Hogle on this point constituted a denial of the petitioner's fundamental right to due process.

Finally, petitioner raises as his fourth argument the contention that prosecutorial misconduct occurred during closing arguments to the jury. Petitioner contends that the trial court's refusal to grant defense counsel's motion for a mistrial was improper after the court had interrupted the prosecutor's explanation to the jury of the law on voluntary intoxication to tell them that the prosecutor's explanation was incorrect.

The scope of review by this Court on habeas corpus is the narrow one of due process, not the broad, supervisory power it possesses over the conduct of its own trials. *Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). Thus, in habeas proceedings, this Court does not sit as a "super state supreme court" to review errors under state law governing the limits of permissible argument. *Houston v. Estelle,* 569 F.2d 372, 380 (5th Cir.1978). While this Court cannot impose on state prosecutors the standards which it applies to federal prosecutors, both standards provide guidance in determining the merits of a due process claim, because both find their sources in notions of fundamental fairness. *See, Bergenthal v. Cady,* 466 F.2d 635, 637 (7th Cir.1972), *cert. denied,* 409 U.S. 1109, 93 S.Ct. 913, 34 L.Ed.2d 690 (1973).

The Indiana standard regarding state prosecutorial misconduct is set forth in *Maldonado v. State,* 265 Ind. 492, 355 N.E.2d 843 (1976). The Supreme Court of the State of Indiana therein held that once a prosecutor's remarks are found to be improper, the reviewing court must examine the probable effect of those remarks on the jury to determine whether the defendant has been placed in a grave peril to which he should not have been subjected. *Id.,* at 355 N.E.2d 848. Whether such alleged misconduct results in subjecting the defendant to "grave peril" is to be determined by the probable persuasive effect of the statements made on the jury's decision, not the degree of impropriety of the conduct. *Id.; Swope v. State,* 263 Ind. 148, 325 N.E.2d 193 (1975).

The Court of Appeals for the Seventh Circuit has admonished federal prosecutors in strong language regarding the use of improper argument. *See, e.g., United States v. Rodriguez,* 627 F.2d 110, 113 (7th Cir.1980). Thus, in *United States v. Spain,* 536 F.2d 170 (7th Cir.1976), the Seventh Circuit stated that "in the future all federal prosecutors in this circuit will conform their arguments to the standards set by the Supreme Court in the *Berger* case." *Id.,* at 176.

In *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), the Supreme Court of the United States held that the proper role of the prosecutor was as follows:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the two-fold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Id.,* at 88, 55 S.Ct. at 633.

At issue here is a state case, not a federal one, and the prosecutor is a state official. Nonetheless, this Court is dealing with an aspect of a fair trial which is implicit in the Due Process Clause of the Fourteenth Amendment by which the states are bound. *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The Court concluded in *Berger* that in light of the weak case against the defendant the prejudice to his case was highly probable, and a new trial was necessary. The Court went on to state that had the case against Berger been strong or the evidence of guilt overwhelming, a different conclusion might have been reached. *Berger,* at 89. The Seventh Circuit further enunciated this approach in *Rodriguez, supra,* stating that "an arguably improper remark [by the prosecutor] will

require determination of its probable effect on the jury in combination with all the evidence presented." *Id.,* at 113. If the evidence of guilt is sufficient to find beyond a reasonable doubt that the error was harmless, reversal is not required. *Id.; United States v. Buege,* 578 F.2d 187, 189 (7th Cir.1978). This is in keeping with the general rule that the remarks made by a prosecutor must be shown to have been so prejudicial as to render the trial fundamentally unfair. *Cobb v. Wainwright,* 609 F.2d 754 (5th Cir.1980), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857.

In the prosecutor's closing argument, the following appears in the record:

> STATE: " . . . I am going to get into a discussion of the law and it is going to be altered discussion from what I had originally reserved.
>
> "And the first thing was that regarding the voluntary use of drugs is not a defense, you will be instructed, regarding that. However, I don't notice any change in the law that my understanding, it has always been the law that it is as a general rule not a defense.
>
> "However, the statute in the case law says that it can be specific intent. All right, the question automatically arises, what cases have specific intent, what cases don't.
>
> "It is a question of law. I reserved this matter and getting from the Indiana Supreme Court a case of Creedy versus State, decided August 18, 1975.
>
> "There they come out and say specific intent is not an element of second degree murder. Meaning to me that if a case in the charge were first degree murder, there is specific intent.
>
> "I want to point out if I haven't that I really—"
>
> COURT: "That is an incorrect statement, ladies and gentlemen."
>
> STATE: "All right, your Honor, now I have read from this case—"
>
> COURT: "Your statement to the jury on the law is incorrect."

> STATE: "All right. I want to continue with what the instruction you will hear and that the Court and I obviously disagree on what this means. But I will tell you if his Honor tells me I am wrong, that specific intent is an element of first degree murder."
>
> COURT: "It is not."
>
> STATE: "Then I don't know where it would come in. I mean we are talking about various degrees of culpability and my thinking on the situation is a person does things with the most legal culpability, first of all when they think about it. When they premeditate it for a period of time, then do it.
>
> "And then if they go ahead and mean to do it without thinking about it. I am talking about a criminal action that we are getting on lesser degrees of culpability, going to negligent about doing something and going down to something just being an accident and happening.
>
> "And that is the basis of my thought."
>
> COURT: "May I see counsel at the bench please?"
>
> "That is so wrong and I can't cure it. That is so basically wrong, there is nothing I can say that is going to cure it without me taking off this robe and going down and addressing the jury on specific intent. Must be contained in the definition of the crime itself.
>
> "For example, assault and battery with intent to kill. With intent to kill is specific intent. Period. The general means required in every criminal case is not specific intent. There is never specific intent and will never be specific intent."
>
> STATE: "Okay."
>
> COURT: "There are only a few cases with specific intent. Namely, assault and battery with intent to kill and its ilk. That is not what you said. I don't know that it is harmful to the defendant because it doesn't make any sense."
>
> "The charge is not murder in the first degree, it is murder second degree. It does not involve specific intent. As

soon as you say the word specific intent factors have to be brought into the case which is not supported in the evidence or the law."

"Quoting from a case, no application to this one is error, but counsel is not objecting to it. I assume that what he is going to read is a case out of context and say something to the contrary. It would be better for all of us concerned if you would leave the law to the Court except—accept it, argue it and if you feel that it is a mistake, appeal it."

"But this is not helpful for the jury to determine the case at all."

DEFENSE: "Your Honor, at this point, I should move for a mistrial."

COURT: "On what ground?"

DEFENSE: "As result of the introduction into evidence of obscure—"

COURT: "There is no evidence here, we are in final arguments."

DEFENSE: "Prejudicial effect it would have confusing the jury."

COURT: "Have to clean it up the best you can."

DEFENSE: "I have made the record on that point."

COURT: (To the jury) "Let me say one word to the jury before counsel again commences. This entire area has been a subject of debate for a number of years in the legal profession itself and although it may appear to be an easy subject to one not having full knowledge of the entire ramifications of the issues on both sides, believe me it is not easy."

"And I think the arguments will go on for a number of years yet, before it is finally resolved. All right, Mr. Greener, continue."

*Record,* 493–96.

 The above colloquy indicates nothing more than the prosecutor getting sidetracked on a nonissue. There is no showing of any prejudice which would render the trial fundamentally unfair. Further, final instructions are presumed to correct any misstatements of law made during the course of final argument. *Tyson v.*

*State,* Ind. 386 N.E.2d 1185, 1192 (1979); *see also, United States v. Wilkins,* 659 F.2d 769, 774 (7th Cir.1981). Therefore, based on the above, this Court concludes that whatever impropriety may have existed in the prosecutor's closing argument to the jury was not prejudicial to the defendant-petitioner such as to render the trial fundamentally unfair, and that the final instructions given by the Court adequately corrected whatever mistakes were made by the prosecution.

For all of the above stated reasons, and after a careful review of the entire state record, this Court now DENIES the petition for writ of habeas corpus, and DISMISSES this action. SO ORDERED.