FISHER *v.* THE STATE.

CRIMINAL LAW.—*Voluntary Intoxication.*—Mental incapacity, produced by voluntary intoxication, existing only temporarily, is no defence to a prosecution for a crime committed by a person while he is so intoxicated and mentally incapable.

SAME.—*Insanity Produced by Disease Resulting from Habitual Intoxication.*—Insanity resulting from the habit of intoxication which, though voluntary, has been long continued, and has produced disease which has so perverted or destroyed the mental faculties as to render the person so afflicted incapable, by reason of such disease, of acting from motive, or of distinguishing right from wrong, when sober, is a defence to a prosecution for a crime committed by him while in such condition.

SAME.—*Weight of Evidence.—Supreme Court.*—The Supreme Court, on appeal, will not disturb a verdict against the defendant in such case, on the mere weight of conflicting evidence as to his mental condition.

SAME.—*Newly-Discovered Evidence.— New Trial.*— Newly-discovered evidence is not sufficient ground for a new trial, unless it comes within the rule laid down in clause 7 of section 352, p. 181, and in section 142, p. 409, 2 R. S. 1876.

SAME.—*Arrest of Judgment.*—The judgment in a criminal prosecution may be arrested for either of the causes stated in section 144, 2 R. S. 1876, p. 409.

From the Clinton Circuit Court.

*A. E. Paige, S. O. Bayless* and *J. U. Gorman,* for appellant.

*T. W. Woollen,* Attorney General, for the State.

PERKINS, J.—An indictment was duly returned, charging that Elias Fisher, who is the appellant, " on the 27th day of November, 1878, at the county and State aforesaid, did then and there unlawfully and feloniously steal, take and carry away ten pieces of silver money, coinage of the United States of America, of the denomination and value of fifty cents each," etc.

The defendant was arraigned and pleaded not guilty. He was tried by a jury, found guilty, and his punishment was fixed at imprisonment in the state-prison for one year, to which was added a fine of twenty-five dollars, disfranchisement, etc.

A motion for a new trial, for the reasons that the verdict was not sustained by the evidence, and that material evidence had been discovered since the trial, was overruled, and judgment and sentence pronounced.

It is assigned for error in this court:

1. That the court erred in overruling the motion for a new trial; and,

2. That the court erred in overruling the motion in arrest of judgment.

The grounds specified in the motion for a new trial, as has been stated, were, that the verdict was not sustained by the evidence given, and newly-discovered evidence.

We can not say that the evidence did not establish the larceny beyond a reasonable doubt, if the appellant

was mentally capable of the commission of the crime. The defence mainly relied upon, on the trial, was mental incompetency, arising from voluntary drunkenness. The evidence in the cause touching the mental condition of the appellant, defendant below, was as follows; but, before copying it, we may state, that, on the 27th day of November, 1878, the day of the commission of the alleged larceny, the appellant was very drunk; he perpetrated the act charged as the crime for which he is indicted, while he was actually drunk. We proceed to copy the evidence:

"The defendant, to sustain his defence to the charge contained in the indictment in said cause, introduced the following evidence, viz.:

"Charles Sipes testified: 'My name is Charles Sipes; I live in Frankfort; have lived here forty years. I have known the defendant since his birth; I have seen him every day for three years. I don't know to have seen him sober for eighteen months past, except for a few weeks. Drink makes him crazy. He is that way nearly all the time. I have seen him frequently, during the past two years, in that same way, and several times in the last year. His drunken sprees would last for a week or more. He would be wandering about doing nothing. I have talked with him frequently. When drunk, he would never talk with any sense. Have seen him crying. From what I have stated, he was, I think, of unsound mind, and I think he was in the same condition on the 27th of November last.'

"On cross-examination he said: 'I have my opinion from the acts of his life, and his every day life, as I have stated. I saw him several times during the last summer. I was at work in the country last summer and came home frequently, and every time I saw him he was drunk. I was in town two-thirds of my time for the last six months. He was drunk nearly every time I saw him.'

"Noah T. Catterlin testified: 'I have lived in Frankfort forty-eight years. I have known the defendant since he was a child. During the past three years I have seen him nearly every day, sometimes oftener. He is in the habit of getting drunk. Except a short time when he worked for me, he has been drinking and spreeing around all the time. He was hardly ever sober. When he is drunk he is crazy, and don't know any thing. He is drunk so much that his mind is nearly gone. He will quarrel with his best friends. I remember one occasion, I think in October, last fall, he was drunk and had a quarrel in front of my store. He was crazy, and no one could do any thing with him. Have seen him often during the last six months, and nearly every time I saw him he was under the influence of liquor, and drunk. From the facts I have stated, I think he was of unsound mind on the 27th of last November, and for several days before and after that date.'

"On cross-examination the witness said: 'He has no mind of his own, no power to resist the temptation to drink. When he worked for me, after he got the whiskey out of him, he was a good boy, perfectly honest, and a good boy to work. When drinking, or drunk, he does not know right from wrong. He is all right when sober— after he has been sober for a week or so—after he gets the whiskey out of his system.'

"Joseph W. Aughe testified: 'I know the defendant, and have known him for a number of years; have seen him nearly every day for the past year; do not know of him doing any thing around. He is in the habit of getting intoxicated; would get drunk any time when he could get whiskey; do not know whether he was insane or not.'

"Noah T. Fisher testified: 'I am a brother of the defendant. I have seen him nearly every day for the two years last past. He has been doing nothing, except for a short time when he worked for grandfather, but drinking. He

would be drunk all the week, for several weeks at a time. He has been drunk most of the time for the past year. During this time his actions have attracted my attention several times. At one time he pawned my two-dollar hat for a drink. Several little articles about the house he took and pawned for a drink. One time when drunk, he took my overcoat, worth fourteen dollars, and tried to sell it for a drink. One time, when drunk, he tried to take a wash-stand, but could not move it. He was drunk on the 27th day of November last. From the facts I have stated, I do not think he was of sound mind on the 27th day of last November. He did not know right from wrong. He took my cap in the last fall.'

"George Maddux testified: 'I saw the defendant in Thomas Taylor's saloon,'" (in which the testimony was that the alleged larceny was committed,) "'at the time he was with Cohee and Good, on the 27th of November last. The defendant was drunk, and so was Cohee. The defendant did not know what he was doing, like the rest; were all drunk. Fisher was the drunkest. I thought that he went out at the front door, but may have been mistaken about that. Fisher went out first; said "I am going home to my mother's." I did not see him have any money that day; did not see him take any money, sack or bag from Cohee, or from the counter in Taylor's saloon, while there.'

"In rebutting, Nathan Fletcher testified that he knew the defendant, and thought he was, at that time, of sound mind.

"Samuel Aughe testified thus: 'I know the defendant, and saw him nearly every day last summer. I never saw him in any place of business; saw him on the street, standing around talking; saw him at work once, about two years ago. I think he is of sound mind now. I know the defendant, and have seen him often. I think he had good

sense when he was not drinking. I have not talked with the defendant since May last.' "

Such was the testimony touching the previous habits, and the mental and moral condition of the appellant, at the time of the commission of the alleged offence. None of it was objected to.

As a general proposition of law, mental incapacity, produced by voluntary intoxication, existing only temporarily, but at the time of the commission of the offence (in this case the larceny charged), is no excuse for the crime, nor a defence to a prosecution therefor. Bicknell Crim. Prac. 340. But where the habit of intoxication, though voluntary, has been long continued, and has produced disease, which has perverted or destroyed the mental faculties of the accused, so that he was incapable, at the time of the commission of the alleged crime, on account of the disease, of acting from motive, or distinguishing right from wrong when sober—in short, insane—he will not be held accountable for the act charged as a crime, committed while in such condition. *O'Herrin* v. *The State*, 14 Ind. 420 ; *Dawson* v. *The State*, 16 Ind. 428 ; *Bailey* v. *The State*, 26 Ind. 422 ; *Bradley.* v. *The State*, 31 Ind. 492 ; *Cluck* v. *The State*, 40 Ind. 263.

There are cases which hold, that, in prosecutions for murder, drunkenness at the time may be shown as affecting the question of premeditation. 1 Archbold Crim. Prac· & Pl., by Pomeroy, p. 30.

As an enunciation, and an example of the application of the general doctrine of the law on this subject, we present the facts and opinion of the court in the leading case of *The United States* v. *Drew*, 5 Mason, 28 :

" It appeared, that for a considerable time before the fatal act " (killing of Clark), " Drew had been in the habit of indulging himself in very gross and almost continual drunkenness; that about five days before it took place, he ordered

all the liquor on board, which was accordingly done. He soon afterward began to betray great restlessness, uneasiness, fretfulness and irritability; expressed his fear that the crew intended to murder him; and complained of persons, who were unseen, talking to him, and urging him to kill Clark; and his dread of so doing. He could not sleep, but was in almost constant motion during the day and night. The night before the act, he was more restless than usual, seemed to be in great fear, and said, that whenever he laid down there were persons threatening to kill him, if he did not kill the mate, etc. In short, he exhibited all the marked symptoms of the disease brought on by intemperance, called *delirium tremens.*"

Opinion of the court delivered by Judge STORY:

"We are of opinion, that the indictment upon these admitted facts can not be maintained. The prisoner was unquestionably insane at the time of committing the offence. And the question made at the bar is, whether insanity, whose remote cause is habitual drunkenness, is, or is not, an excuse in a court of law for a homicide committed by the party, while so insane, but not at the time intoxicated or under the influence of liquor. We are clearly of opinion, that insanity is a competent excuse in such a case. In general, insanity is an excuse for the commission of every crime, because the party has not the possession of that reason, which includes responsibility. An exception is, when the crime is committed by a party while in a fit of intoxication, the law not permitting a man to avail himself of the excuse of his own gross vice and misconduct, to shelter himself from the legal consequences of such crime. But the crime must take place and be the immediate result of the fit of intoxication, and while it lasts; and not, as in this case, a remote consequence, superinduced by the antecedent exhaustion of the party, arising from gross and habitual drunkenness. However criminal in a moral

point of view such an indulgence is, and however justly a party may be responsible for his acts arising from it to Almighty God, human tribunals are generally restricted from punishing them, since they are not the acts of a reasonable being. Had the crime been committed while Drew was in a fit of intoxication, he would have been liable to be convicted of murder. As he was not then intoxicated, but merely insane from an abstinence from liquor, he can not be pronounced guilty of the offence. The law looks to the immediate, and not to the remote cause; to the actual state of the party, and not to the causes, which remotely produced it. Many species of insanity arise remotely from what in a moral view, is a criminal neglect or fault of the party, as from religious melancholy, undue exposure, extravagant pride, ambition, etc. Yet such insanity has always been deemed a sufficient excuse for any crime done under its influence."

In the case before us, the evidence satisfactorily proved that the appellant was intoxicated when he committed the offence with which he was charged in the indictment; that he was an habitual drunkard; but we can not say, after the verdict of the jury, that continuous excessive use of liquor had caused disease producing insanity or idiocy, as a mental condition of that permanency which would render him unaccountable for crime by him committed. We know, as matter of general knowledge, that such mental condition is not the necessary result of such drunkenness.

The application for a new trial, so far as it was based upon newly-discovered evidence, was not brought within the legal rule touching such applications for such cause. 2 R. S. 1876, p. 409; 2 R. S. 1876, p. 181, and notes.

Judgment in a criminal cause may be arrested for either of the following causes:

1. "That the grand jury who found the indictment had no legal authority to inquire into the offence charged, by

reason of it not being within the jurisdiction of the court."

2. "That the facts stated do not constitute a public offence." 2 R. S. 1876, p. 409, sec. 144.

Neither of these grounds for arresting the judgment existed.

The judgment is affirmed, with costs.