John R. BERRY IV, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A04–1008–CR–536.

Court of Appeals of Indiana.

July 20, 2011.

Transfer Granted October 17, 2011.

Patricia Caress McMath, Marion County Public Defender, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Richard C. Webster, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

1. Ind.Code §§ 35–41–5–1, 35–42–1–1.

## OPINION

CRONE, Judge.

### Case Summary

John R. Berry IV, told a man that he was going to kill him and assaulted the man with a hammer. The State charged Berry with class A felony attempted murder.[1] At trial, Berry argued that he was not responsible by reason of insanity at the time of the crime pursuant to Indiana Code Section 35–41–3–6. The trial court rejected Berry's insanity defense, finding that Berry's psychotic symptoms at the time of the crime were caused by his voluntary use of alcohol and that Berry was able to appreciate the wrongfulness of his conduct. The trial court found Berry guilty as charged.

On appeal, Berry argues that there is no evidence that he was intoxicated at the time of the crime and that it is improper, as a matter of law, to conclude that his psychotic symptoms were voluntarily induced. He also argues that his conduct before, during, and after the offense does not support a reasonable inference of sanity.

■ We conclude that there is no evidence that Berry was intoxicated when he committed the offense. We adhere to the longstanding principle that a defendant suffering from a mental disease or defect caused by severe, prolonged, and chronic alcohol abuse that renders that person unable to appreciate the wrongfulness of his or her conduct is not responsible for prohibited conduct committed while in that condition. We conclude that the evidence is undisputed that at the time of the offense Berry suffered from psychotic symptoms caused by his prolonged and severe alcohol abuse and that he was unable to appreciate the wrongfulness of his conduct.

Accordingly, we conclude that the trial court erred in rejecting his insanity defense. We reverse the judgment of the trial court and remand with instructions to find Berry not guilty by reason of insanity and for further proceedings as required by the Indiana Code.

### Facts and Procedural History

Berry is an alcoholic. Born in May 1971, he began drinking when he was nine years old and was drinking to intoxication on a daily basis by the time he was a high school sophomore. When he was fifteen, his mother sent him to Koala Hospital for substance abuse treatment, but he resumed drinking shortly thereafter. Berry also used marijuana and cocaine on a daily basis and took LSD, ecstasy, and methamphetamine. When he was thirty years old, he went to Fairbanks Hospital for alcoholism. After age thirty, he continued to drink large amounts of alcohol, but he stopped using the other drugs.

In 1999, following two arrests for driving under the influence, Berry was hospitalized at Community North Hospital and diagnosed with bipolar disorder.[2] He was treated with Depakote, a mood-stabilizing medication. At that time, he was twenty-seven or twenty-eight years old. Since 1999, Berry has been hospitalized multiple times at Community North and Wishard Hospitals, usually for a combination of symptoms of bipolar disorder, methamphetamine abuse, and alcohol dependence with withdrawal seizures, including at least one instance of delirium tremens. Delirium tremens, also referred to as DTs, is a severe form of alcohol withdrawal in which a person may experience seizures and hallucinations and become psychotic.[3] Tr. at 275. Berry has been treated with a variety of medications including lithium, a mood-stabilizing medication; Seroquel, Risperdal, and Zyprexa, antipsychotic medications; Klonopin, an antianxiety medication; and Paxil, an antidepressant.

In 2009, Berry lived with his father, John Berry III ("Father"). On Tuesday, February 3, 2009, Berry left Father's house to go to a "Plainfield party house." *Id.* at 310. Berry drank heavily on Saturday and had a couple drinks on Sunday. On Sunday, he returned to Father's house. Berry had last been treated with psychiatric medications fourteen months earlier.

---

2. The National Institute of Mental Health defines bipolar disorder, also known as manic-depressive illness, as

   a brain disorder that causes unusual shifts in mood, energy activity levels, and the ability to carry out day-to-day-tasks.

   . . . .

   People with bipolar disorder experience unusually intense emotional states that occur in distinct periods called "mood episodes." An overly joyful or overexcited state is called a manic episode, and an extremely sad or hopeless state is called a depressive episode. Sometimes, a mood episode includes symptoms of both mania and depression. This is called a mixed state. People with bipolar disorder also may be explosive and irritable during a mood episode.

   . . . .

   Sometimes, a person with severe episodes of mania or depression has psychotic symptoms too, such as hallucinations or delusions. The psychotic symptoms tend to reflect the person's extreme mood. For example, psychotic symptoms for a person having a manic episode may include believing he or she is famous, has a lot of money, or has special powers. In the same way, a person having a depressive episode may believe he or she is ruined and penniless, or has committed a crime.

   NAT'L INST. OF MENTAL HEALTH, http://www.nimh.nih.gov/health/publications/bipolar-disorder/complete-index.shtml (last visited July 6, 2011).

3. Delirium tremens typically occur between forty-eight and seventy-two hours after the last drink. Tr. at 275.

Early Monday morning, February 9, 2009, Father went to the basement to work out and found Berry sitting on the couch reading the Bible. For about an hour, Berry continued to read the Bible while Father worked out. Afterward, Father and Berry got ready to go to Gary Monday's house, which they were helping to repair. On the way there, they stopped to buy plumbing supplies. When they got to Gary's house, Father parked his truck on the street in front of the house, and they went inside.

Gary's brother, Tony Monday, was also doing work on the house. Tony had tiled the bathroom the previous day and was in the bathroom cleaning it up when Father and Berry arrived. Father and Tony greeted each other, and Tony told Father that he had borrowed his cordless drill and hammer and the tools were in the bathroom. Father told him that was fine. Berry and Tony did not know each other. Father took Berry into a bedroom to install drywall. Father explained the job to Berry and told him that he needed the drill and hammer in the bathroom. Father then went to the living room to make a pot of coffee.

Tony was still in the bathroom cleaning up. Berry entered and told Tony that he was going to kill him. *Id.* at 84. Tony asked him why. Berry told him to "shut up" and repeated that he was going to kill him. *Id.* Berry hit Tony multiple times in the head with a hammer and also struck Tony's hand when he attempted to protect himself.

Father was in the living room making coffee when he heard somebody say "damn." *Id.* at 123. He thought that maybe Tony had broken a tile. Father heard another sound that made him turn around, and he saw Tony in the hall bleeding profusely from the head. Father sat Tony down and asked him what happened.

Tony told him that Berry had hit him with a hammer. Father realized that the injuries were serious and called 911. Father tried to stop the bleeding by putting direct pressure on Tony's injuries with a roll of paper towels.

As Father was tending to Tony's injuries, he saw Berry walking back and forth in the kitchen, wiping the hammer with a white towel. Father asked Berry, "Did you hit him with the f* * *ing hammer?" *Id.* at 131. Berry was staring off into space. He turned and said, "I guess so," in a questioning manner. *Id.* Father noticed that "[Berry] wasn't mad. He wasn't excited. He just wasn't there." *Id.* Father told Berry to put the hammer away and go to the garage. *Id.* at 165. Berry went out the back door and walked around to the front of the house. He put the hammer and towel in a chest of drawers that was lying in the bed of Father's truck. Berry came back into the kitchen and told Father that he could not find the garage. Father explained where the garage was (about ten to twelve feet behind the house) and told Berry to go there. Berry complied.

Police and medics arrived at the house. Father told the police that Berry was in the garage. The police went to the garage and found the door locked. They knocked and asked if Berry was inside, and he answered yes. The police asked Berry to open the door, but he did not respond. When the medics arrived to care for Tony, Father came out to the garage and told Berry to open the door and come out. Berry obeyed, and police handcuffed him. Police described Berry as "calm, cool" and said that he provided "no resistance." *Id.* at 213. Police asked Berry where the hammer was, and he told them it was in a drawer in the truck. Police described Berry's speech as clear and understandable. When the police went to a truck

parked in back of the house, Berry told the police that the hammer was in the truck parked in front of the house. Police found the hammer wrapped in a towel where Berry told them it would be.

The police questioned Berry about what happened, and he was cooperative. Berry admitted that he hit Tony with a hammer and that he knew he was hitting Tony. When asked why he wrapped the hammer in a towel and put it in the drawer in the truck, Berry stated that Father had told him to. *Id.* at 238–39. However, some of Berry's answers were "nonsensical." *Id.* at 232. He told one officer that he had been reading the Bible, and that when he arrived at the house, God told him that it was time to go. He stated that he hit Tony because Tony was caught playing with the eagle, and God told him to hit Tony. He told a different officer that Tony was attacked by an eagle.

Berry was taken to Wishard Hospital and was admitted to Midtown Community Mental Health Center for stabilization of psychosis. The treating physician, Dr. Kimberly Mayrose, noted, "Thought processes were disorganized, possible flight of ideas. Can at times give short logical answers. Thought content delusional, grandiose, religious." Appellant's Addendum to Br. at 4. Dr. Mayrose's admission summary indicates that "[Berry] reported a history of Bipolar Disorder and alcohol dependence, including DT's and seizures. He reported drinking a 5th of alcohol daily, although he drank a few sips Sunday night, February 8, 2009." *Id.* Dr. Mayrose's Axis I diagnosis of Berry was "Bipolar Disorder, type I, mixed and Alcohol dependence, possible withdrawal (not

DT's)." [4] *Id.* Berry was treated with lithium and Seroquel and was discharged on February 16, 2009. His discharge diagnosis was "Bipolar I Disorder, Mania Stabilizing[ ]; and Alcohol Dependence." Ex. at 81.

As a result of Berry's attack, Tony suffered eight lacerations to his head and one on his right hand. Tony underwent surgery to repair his nose, sinuses, eye sockets, and broken jaw. Titanium plates were implanted into his skull to repair his head and facial injuries. Tony has lost vision in one eye and suffers diminished vision in the other. In addition, he can no longer use his dentures due to the injury to his jaw.

On February 20, 2009, the State charged Berry with class A felony attempted murder. He was placed in the jail mental health unit, and his treatment with lithium and Seroquel was continued. Berry filed a notice of intent to raise the insanity defense. The trial court appointed Dr. Don A. Olive, clinical neuropsychologist, and Dr. Ned P. Masbaum, forensic psychiatrist, to examine Berry to determine whether he was competent to stand trial and whether he was legally insane at the time of the offense. Berry also sought his own evaluation from Dr. George F. Parker, an associate professor of clinical psychiatry at Indiana University School of Medicine. Dr. Masbaum met with Berry on April 9, 2009, for approximately one hour. Dr. Olive met with Berry on May 9, 2009, for an unknown length of time. Dr. Parker met with Berry on September 15, 2009, for approximately two and one-half

---

4. "Axis I disorders are the mental health disorders recognized by the [*Diagnostic and Statistical Manual of Mental Disorders–Fourth Edition*], except for personality disorders and mental retardation (which are both reported on Axis II)." *Galloway v. State,* 938 N.E.2d 699, 703 n. 3 (Ind.2010). As such, a finding that Berry has an Axis I disorder means that he has a recognized mental illness. *See id.* A mixed state is a mood episode that includes symptoms of both mania and depression. *See* n.2, *supra.*

hours. Berry was being treated with lithium and Seroquel throughout this period.

All the doctors found that Berry was competent to stand trial.[5] As to Berry's mental state at the time of the offense, Dr. Masbaum concluded in his report that Berry's psychotic symptoms "were a result of voluntary alcohol & substance use/intoxication/withdrawal or a combination of all. Based on my experience and training, violent behavior is more likely with the combination of alcohol & substances and a severe mental disorder rather than the disorder alone." *Id.* at 89. Dr. Masbaum was unable to form an opinion regarding Berry's ability to appreciate the wrongfulness of his conduct at the time of the offense.

In their reports, Dr. Olive and Dr. Parker both concluded that Berry's psychotic symptoms were the result of his bipolar disorder and that Berry was unable to appreciate the wrongfulness of his conduct at the time of the offense. Dr. Olive concluded that

> in reviewing [Berry's] narrative as well as the Probable Cause Affidavit, there appears to be evidence that Mr. Berry was unable to appreciate the wrongfulness of his conduct. Per the admission summary from Wishard Hospital from February 9, 2009, Mr. Berry appears to have been in the midst of a manic episode with psychotic features, as evidenced by persecutory delusions, derealization, and thoughts of control. Although the record from Wishard indicates that Mr. Berry might possibly had [sic] been in the midst of alcohol withdrawal, there is no evidence of delirium tremens, the latter of which

might potentially account for some of his symptomatology. Thus, I am of the opinion that Mr. Berry's alleged conduct appears to be the direct product of the aforementioned symptomatology stemming from his Bipolar Disorder With Psychotic Features.

*Id.* at 85.

Dr. Parker found that

> Mr. Berry meets criteria for diagnosis with bipolar disorder, most recent episode mixed, with psychotic features. ...
>
> .... Based on [Berry's] active psychosis at the time of the assault, his attribution of the assault to an eagle (a symbol for God) and to God's message to him, and his lack of any attempt to flee the scene or destroy evidence, I believe the defendant did not appreciate the wrongfulness of his actions at the time of the alleged offense.
>
> SUMMARY: It is my opinion, with reasonable medical certainty, that [Berry] was mentally ill, as defined in Indiana statute, at the time of the alleged offenses and did not appreciate the wrongfulness of his actions at the time of the alleged offenses, due to his mental disorder.

*Id.* at 68–69.

Berry waived trial by jury, and a bench trial was held on April 19, 2010, and concluded on April 21, 2010. At trial, Dr. Masbaum's testimony differed from his written evaluation. He expressed doubt regarding Berry's bipolar diagnosis and modified his conclusion that Berry's psychotic symptoms were caused by a combination of his alcohol use and a mental

---

5. The standard of competency to stand trial is whether the defendant " 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and ... has a rational as well as factual understanding of the proceedings against him.' " *Corcoran v. State*, 820 N.E.2d 655, 659 (Ind.2005) (quoting *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)).

disorder. Specifically, Dr. Masbaum testified,

> I question whether [Berry] has bipolar disorder based on his history because bipolar disorder is an exclusionary diagnosis in the sense that many of the symptoms can be the same as caused by alcohol and substance abuse and dependence. And if a person is dependent on alcohol and drugs, that diagnosis is not to be established, if his symptoms are explained on the basis of substance abuse. In other words, substance abuse and alcohol abuse have to be excluded to make a diagnosis of bipolar disorder. And this is why I feel the diagnosis is questionable and does not fit.

Tr. at 397.

Dr. Masbaum further testified that there were four conditions associated with alcohol use that could explain Berry's symptoms and behavior at the time of the offense: alcohol intoxication, pathological intoxication, alcohol induced psychotic disorder, and delirium tremens. As to alcohol intoxication, Dr. Masbaum acknowledged that no one stated that Berry appeared intoxicated, but he testified that "a person with chronic alcoholism can be drinking and not show any signs of intoxication outwardly whatsoever." *Id.* at 398. Dr. Masbaum testified that pathological intoxication "is a state where a person becomes very violent and agitated behaviorally on relatively small amounts of alcohol at the time." *Id.* Dr. Masbaum explained that alcohol induced psychotic disorder is caused by excessive drinking and "can be looked at as a withdrawal syndrome," but it is "relatively rare." *Id.* Dr. Masbaum had "only seen a couple cases of it" during his career. *Id.* Dr. Masbaum noted that these three conditions are "connected with voluntary alcohol use." *Id.* at 399. The last, delirium tremens, is, according to Dr. Masbaum, "the only one to fall in the category of being a severe mental disorder at the time." *Id.*

The trial court asked Dr. Masbaum which of the four possibilities was most likely in Berry's case. Dr. Masbaum answered,

> Well, since [Berry] did not go into delirium tremens, and perhaps it was prevented by being there at Wishard, but they did not diagnose that; then I believe one of the other three alcohol situations explain his symptoms and probably the first one, acute alcoholic intoxication, although the second also could be a factor. It's not a clear picture.

*Id.* at 401. However, when later questioned by the prosecutor, Dr. Masbaum agreed that his diagnosis was that Berry "placed himself in the alcohol induced psychosis by voluntarily abusing alcohol." *Id.* at 412.

On July 19, 2010, the trial court issued its findings and judgment, in which it concluded as follows:

> In order to find that [Berry] was suffering Bipolar Disorder with psychotic features, and was therefore unable to appreciate the wrongfulness of his conduct, the trier of fact would have to totally disregard the testimony of Dr. Masbaum, as well as the fact that [Berry], 37 years of age at the time of the assault, has been a severe alcoholic, without interruption, since he was a child. He was not diagnosed as Bipolar until 1999.... According to Dr. Masbaum, a diagnosis for Bipolar Disorder is an exclusionary diagnosis and can be made only if other possible causes of the person's symptoms can be excluded. Someone who is an alcoholic, and whose chronic alcoholism can provoke the same symptoms as those occurring in a person with Bipolar Disorder, cannot be diag-

nosed as bipolar. This statement by Dr. Masbaum was neither questioned nor contradicted.

The Court finds that the evidence in this case is sufficient to sustain the conclusion beyond a reasonable doubt that [Berry] was sane at the time of his assault on Tony Monday:

(1) [Berry's] conduct and statements before, during, and after the attack point to his knowledge of the wrongful nature of his actions.

(2) [Berry's] conduct during the assault constituted a substantial step toward the commission of the intended crime of killing Tony Monday.

(3) The psychotic symptoms displayed by [Berry] began during his alcohol binge on Saturday and Sunday and continued into the morning of the assault. Given [Berry's] longstanding and chronic alcoholism, coupled with his heavy drinking on the weekend preceding the assault on Monday morning, February 9, the Court concludes that these symptoms were brought on by [Berry's] voluntary abuse of alcohol, rather than the result of Bipolar Disorder or other mental disease or defect.

Appellant's Addendum to Br. at 14–15. The trial court found Berry guilty as charged.

## Discussion and Decision

### A. Insanity Defense

Berry challenges his conviction for attempted murder. On appeal, he does not contend that the State failed to establish beyond a reasonable doubt the elements of the offense. See Ind.Code § 35–41–4–1 ("A person may be convicted of an offense only if his guilt is proved beyond a reasonable doubt."). Rather, Berry argues that the trial court erred in rejecting his insanity defense. When a defendant raises the insanity defense, the trier of fact has the additional options of returning a verdict of either "not responsible by reason of insanity at the time of the crime" ("NRI") or "guilty but mentally ill at the time of the crime" ("GBMI"). Ind.Code § 35–36–2–3.[6] Berry contends that he is NRI.

The insanity defense is governed by Indiana Code Section 35–41–3–6, which provides,

(a) A person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense.

(b) As used in this section, "mental disease or defect" means a severely abnormal mental condition that grossly and demonstrably impairs a person's perception, but the term does not include an abnormality manifested only by repeated unlawful or antisocial conduct.[7]

6. Unlike an NRI verdict/judgment, a GBMI verdict/judgment is a conviction and the defendant is sentenced in the same manner as a defendant found guilty. Ind.Code § 35–36–2–5(a). The differences between the result of an NRI verdict and a GBMI verdict are discussed in Galloway, 938 N.E.2d at 708 n. 9. In brief, we observe that

[w]hen an NRI verdict is rendered, the prosecutor is required to initiate a civil commitment proceeding under either section 12–26–6–2(a)(3) (temporary commit-

ment) or section 12–26–7 (regular commitment) of the Indiana Code. See I.C. § 35–36–2–4. The defendant remains in custody pending the completion of the commitment proceeding. Id. The trial court may order the defendant committed if it finds by clear and convincing evidence that the defendant is currently mentally ill and either dangerous or gravely disabled.

Id.

7. Our statute is a variation of the Model Penal Code, which reads,

The insanity defense is an affirmative defense for which the defendant carries the burden of proof by a preponderance of the evidence. Ind.Code § 35–41–4–1. The defendant must establish both that (1) he or she suffers from a mental disease or defect and (2) the mental disease or defect rendered him or her unable to appreciate the wrongfulness of his or her conduct at the time of the offense. *Galloway v. State*, 938 N.E.2d 699, 708 (Ind.2010). "Although insanity and GBMI both require proof of some form of mental disorder or impairment, a finding of insanity also requires a showing of the defendant's inability to understand the wrongfulness of the criminal conduct; mental illness alone is not a defense to a crime." *Weeks v. State*, 697 N.E.2d 28, 29 (Ind.1998). "A defendant who is mentally ill but fails to establish that he or she was unable to appreciate the wrongfulness of his or her conduct may be found [GBMI]." *Galloway*, 938 N.E.2d at 708.

The trier of fact's finding regarding a defendant's sanity at the time of the offense warrants substantial deference from reviewing courts. *Id.* at 709. "A convicted defendant who claims that his [or her] insanity defense should have prevailed at trial is in the position of one appealing from a negative judgment, and we will reverse only when the evidence is without conflict and leads only to the conclusion that the defendant was insane when the crime was committed." *Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004). "As such, we will not reweigh the evidence or assess the credibility of witnesses but will consider only the evidence most favorable to the judgment and the reasonable and logical inferences to be drawn therefrom." *Jones v. State*, 825 N.E.2d 926, 929 (Ind.Ct.App.2005), *trans. denied.*

As to expert testimony, we observe that

Indiana Code section 35–36–2–2 provides for the use of expert testimony to assist the trier of fact in determining the defendant's insanity. Such expert testimony, however, is merely advisory, and even unanimous expert testimony is not conclusive on the issue of sanity. The trier of fact is free to disregard the unanimous testimony of experts and rely on conflicting testimony by lay witnesses. And even if there is no conflicting lay testimony, the trier of fact is free to disregard or discredit the expert testimony.

*Galloway*, 938 N.E.2d at 709 (footnote and citations omitted). "[T]estimony regarding behavior before, during, and after a crime may be more indicative of actual mental health at the time of the crime than mental exams conducted weeks or months later." *Thompson*, 804 N.E.2d at 1149.

### B.  Mental Disease or Defect

We first address whether the evidence that Berry suffered a mental disease or defect at the time of the offense is without conflict and leads only to the conclusion that Berry was insane when the crime was committed. Here, the trial court found, and the experts agreed, that Berry displayed psychotic symptoms on the morning of February 9. Psychosis is

(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.

(2) As used in this Article, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct. Model Penal Code § 4.01 (2001).

defined as "fundamental derangement of the mind (as in schizophrenia) characterized by defective or lost contact with reality especially as evidenced by delusion, hallucination, and disorganized speech and behavior." MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/psychosis (last visited July 6, 2011). The Indiana Code defines mental disease or defect as "a severely abnormal mental condition that grossly and demonstrably impairs a person's perception." Ind.Code § 35–41–3–6(b). We conclude that psychosis fits the statutory definition of mental disease or defect. Accordingly, the evidence is without conflict and leads only to the conclusion that Berry was suffering from a mental disease or defect at the time of the offense.

However, the experts did not agree on the cause of Berry's psychotic symptoms. In their reports and at trial, Drs. Olive and Parker attributed Berry's psychotic symptoms to his Bipolar Disorder. In his report, Dr. Masbaum concluded that Berry's psychotic symptoms were the result of alcohol intoxication and/or withdrawal and a mental disorder. At trial, Dr. Masbaum testified that Berry's psychotic symptoms could be explained solely by his voluntary alcohol use.[8]

The trial court concluded that, based on Berry's longstanding alcohol abuse and his heavy drinking the weekend before, his psychotic symptoms on the morning of February 9, 2009, were caused by voluntary abuse of alcohol. We observe that Section 35–41–3–6 requires only that a defendant suffer a mental disease or defect; it does not set forth any constraints regarding the source or cause of such disease or defect. However, the trial court found Berry guilty based, in part, on its conclusion that Berry's behavior was caused by voluntary abuse of alcohol. To hold Berry responsible for his crime, the trial court relied on Indiana Code Section 35–41–2–5, which states, "Intoxication is not a defense in a prosecution for an offense and may not be taken into consideration in determining the existence of a mental state that is an element of the offense unless the defendant meets the requirements of I.C. 35–41–3–5."[9] In other words, the legislature has decreed that intoxication will not excuse a person from responsibility for his or her conduct.[10]

Berry argues that there was no evidence that he was intoxicated, and therefore the trial court's conclusion that his psychotic symptoms were brought on by the voluntary use of alcohol is based on speculation, not evidence. Alternatively, Berry argues

8. Although Dr. Masbaum testified that his opinion was that Berry's psychotic symptoms were the result of his voluntary alcohol use, it is unclear from Dr. Masbaum's testimony how this could be so. Dr. Masbaum's initial testimony attributed Berry's behavior to alcohol intoxication and/or pathological intoxication, but his testimony did not link psychosis with either of these conditions.

9. Indiana Code Section 35–41–3–5 provides,
It is a defense that the person who engaged in the prohibited conduct did so while he was intoxicated, only if the intoxication resulted from the introduction of a substance into his body:
(1) without his consent; or

(2) when he did not know that the substance might cause intoxication.

10. To be held culpable for a prohibited action, it is commonly understood that a person must have acted voluntarily. Sanchez v. State, 749 N.E.2d 509, 517 (Ind.2001); see also Ind.Code § 35–41–2–1 ("A person commits an offense only if he voluntarily engages in conduct in violation of the statute defining the offense."). By enacting Indiana Code Section 35–41–3–5, the legislature, has decided that even if there is an act rendered involuntary by intoxication, the intoxication, if voluntary, supplies the general requirement of a voluntary act. Id.

that even if "long-term alcohol dependence explains his conduct, it is contrary to law to conclude that the resulting psychotic state and inability to appreciate the wrongfulness of his conduct was voluntarily induced." Appellant's Br. at 18. We address each argument in turn.

■ Berry asserts that there was no testimony or evidence that he appeared or acted in an intoxicated manner either before or after the assault. Although Dr. Masbaum testified that a person with chronic alcoholism may not exhibit any outward signs of intoxication, there must be some evidence in the record to support an inference of intoxication. *See Pelak v. Ind. Indus. Serv., Inc.,* 831 N.E.2d 765, 769 (Ind.Ct.App.2005) ("An inference is not reasonable when it rests on no more than speculation or conjecture."). Our review of the record before us shows that Berry drank heavily on Saturday, and on Sunday he had a couple drinks. Dr. Parker testified that the time span between Berry's last drinks and the assault made it likely that Berry was sober at the time of the assault. Dr. Olive testified that he did not think that Berry was under the influence of alcohol at the time of the offense. Father was with Berry a couple hours before the assault on the morning of February 9. Father provided no testimony that Berry appeared to be intoxicated. Significantly, neither the police officers who spoke with Berry nor the medical personal who treated Berry after the assault reported signs of intoxication. At the hospital, Berry was observed for signs of alcohol withdrawal, not intoxication. Indeed, Dr. Masbaum himself testified that "there's nothing from the emergency records that indicates that Mr. Berry was under the influence at the time of the offense." Tr. at 426.

■ Implicitly, the State concedes that there was no evidence of intoxication in that it does not contest this assertion. In-stead, the State invites us to draw an inference of intoxication based on evidence of prior incidents in which Berry acted violently when he was intoxicated. The record shows that Berry has acted violently in the past when he was visibly intoxicated. However, there is no evidence that Berry displayed psychotic symptoms during any of those instances, as he did when he committed the current offense. Given that the prior instances of violence involved outward signs of intoxication but no signs of psychosis, the prior incidents do not support a reasonable inference that Berry was intoxicated on the morning of February 9. Accordingly, our review of the record before us reveals no evidence from which a reasonable inference could be drawn that Berry was intoxicated at the time of the crime. It follows that Section 35–41–2–5 is inapplicable.

We must now answer the second question posed by Berry: whether, as a matter of law, Berry's psychotic state, having been caused by prolonged and chronic alcohol abuse, was voluntarily induced such that the insanity defense is inapplicable. Although the State does not address this contention, longstanding Indiana case law supports Berry's argument that his psychotic state was not voluntarily induced.

As early as 1878, Indiana has adhered to the principle that a defendant who manifests a mental disease or defect, as opposed to intoxication, caused by prolonged and chronic alcohol abuse that renders him or her unable to distinguish right from wrong is not responsible for a crime committed while in that condition. That principle is now commonly referred to as "fixed" or "settled" insanity. *See* 22 C.J.S. *Criminal Law* § 147 (2006) (explaining that the fixed or settled insanity defense exists "where the initial choice to abuse alcohol or drugs has become so attenuated over time that it serves little to no purpose

to hold the defendant accountable for that choice once a permanent mental illness has taken hold through years of chronic substance abuse."). The Indiana Supreme Court explained this doctrine as follows:

As a general proposition of law, mental incapacity, produced by voluntary intoxication, existing only temporarily, but at the time of the commission of the offence [sic] . . ., is no excuse for the crime, nor a defence [sic] to a prosecution therefor. But where the habit of intoxication, though voluntary, has been long continued, and has produced disease, which has perverted or destroyed the mental faculties of the accused, so that he was incapable, at the time of the commission of the alleged crime, on account of the disease, of acting from motive, or distinguishing right from wrong when sober—in short, insane—he will not be held accountable for the act charged as a crime, committed while in such condition.

*Fisher v. State,* 64 Ind. 435, 440 (1878) (citations omitted). To illustrate the application of the doctrine, the *Fisher* court quoted with approval the following passage from *United States v. Drew,* 25 F.Cas. 913, 913–14 (C.C.D.Mass.1828):

We are of opinion, that the indictment upon these admitted facts can not be maintained. The prisoner was unquestionably insane at the time of committing the offence [sic]. And the question made at the bar is, whether insanity, whose remote cause is habitual drunkenness, is, or is not, an excuse in a court of law for a homicide committed by the party, while so insane, but not at the time intoxicated or under the influence of liquor. We are clearly of opinion, that insanity is a competent excuse in such a case. In general, insanity is an excuse for the commission of every crime, because the party has not the

possession of that reason, which includes responsibility. An exception is, when the crime is committed by a party while in a fit of intoxication, the law not permitting a man to avail himself of the excuse of his own gross vice and misconduct, to shelter himself from the legal consequences of such crime. But the crime must take place and be the immediate result of the fit of intoxication, and while it lasts; and not, as in this case, a remote consequence, superinduced by the antecedent exhaustion of the party, arising from gross and habitual drunkenness. . . . .Had the crime been committed while Drew was in a fit of intoxication, he would have been liable to be convicted of murder. As he was not then intoxicated, but merely insane from an abstinence from liquor, he cannot be pronounced guilty of the offence [sic]. The law looks to the immediate, and not to the remote cause; to the actual state of the party, and not to the causes, which remotely produced it.

64 Ind. at 441–42 (quotation marks omitted).

The principle that a defendant is not responsible for a crime committed while suffering from a mental disease or defect that, though caused by prolonged and chronic alcohol abuse, renders him or her unable to appreciate the wrongfulness of the prohibited conduct has been acknowledged with approval as recently as 1980. *See Jackson v. State,* 273 Ind. 49, 52, 402 N.E.2d 947, 949 (1980) ("Where the ingestion of intoxicants, though voluntary, has been abused to the point that it has produced mental disease such that the accused is unable to appreciate the wrongfulness of his conduct . . . the law does not hold him responsible for his acts."); *Jackson v. Duckworth,* 549 F.Supp. 1280, 1285 (N.D.Ind.1982) (concluding that instruction that stated that voluntary intoxication is not a defense was counterbalanced with

statement explaining that "a finding of insanity may be based upon extreme or long-term abuse of narcotics or alcohol, irrespective of whether voluntarily or involuntarily ingested" and therefore properly stated Indiana law).[11] Although Indiana Courts have recognized this principle, we have found that it did not apply in cases where (1) there was sufficient evidence that the accused was intoxicated at the time of the offense, *see Fisher,* 64 Ind. at 442; *Jackson,* 273 Ind. at 52, 402 N.E.2d at 949, or (2) there was insufficient evidence of chronic alcoholism and sufficient evidence that the defendant understood the wrongfulness of his actions. *See Anderson v. State,* 177 Ind.App. 603, 606–07, 380 N.E.2d 606, 609 (1978); *Feller v. State,* 264 Ind. 541, 543–44, 348 N.E.2d 8, 12 (1976). Those cases are distinguishable because in the instant case there is no evidence that Berry was intoxicated at the time he committed the offense, and it is undisputed that Berry has a lifelong history of habitual and severe alcohol and drug abuse.

■ For further guidance, we have reviewed decisions from our sister states.[12] Our research has not revealed any recent cases involving severe and prolonged alcohol abuse in which the settled insanity defense was found applicable. A generally informative discussion of the settled insanity doctrine is provided in *State v. Sexton,* 180 Vt. 34, 904 A.2d 1092, 1101–04 (2006):

Scholars have traced the origins of the settled insanity defense in this country to the mid-nineteenth century when courts first considered the culpability of chronic alcoholics for crimes committed in the throes of acute alcohol-induced psychoses, typically marked by hallucinations and paranoid delusions. *See generally* [ANDREW M. LEVINE, *Denying the Settled Insanity Defense: Another Necessary Step in Dealing with Drug and Alcohol Abuse,* 78 B.U.L.Rev. 75, 78 (1998) ] (noting that "[a] Tennessee state court first recognized the rarely invoked doctrine of settled insanity in 1850"); Note, *Intoxication as a Criminal Defense,* 55 Colum. L.Rev. 1210, 1219 n. 66 (1955) (citing early decisions that recognized settled insanity defense in cases of "delirium tremens ... a phenomenon brought about by alcoholic abuse over many years—6 to 10 years of heavy drinking"); Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 153 (4th ed.1994) (observing that "Substance–Induced Persisting Dementia" generally originates from "a pattern of prolonged and heavy substance use" with symptoms that "persist long after use of the substance has stopped," and is generally characterized by "an insidious onset and slow progression" so that it is "rarely" seen in persons under 20).

From its inception to the present, the settled insanity doctrine has been consistently characterized as a state of mind resulting from "long-continued," "habitual," "prolonged," or "chronic" alcohol or drug abuse leading to a more or less permanent or "fixed" state of insanity.

. . . .

Although, with one exception, every state court to consider the issue has recognized the doctrine of settled insani-

11. For a list of cases recognizing a settled insanity defense see *White v. Commonwealth,* 272 Va. 619, 636 S.E.2d 353, 357 (2006). For a brief discussion of contemporary critics of the doctrine see *State v. Sexton,* 180 Vt. 34, 904 A.2d 1092, 1102 n. 7 (2006).

12. Although we are not bound thereto, it is appropriate to look to the decisions of other jurisdictions that have considered a similar issue. *Steiner v. State,* 763 N.E.2d 1024, 1027 (Ind.Ct.App.2002), *trans. denied.*

ty, many states—including Vermont—have simply not addressed it. *See* Levine, *supra*, at 87–88 (noting that twenty-nine states have recognized settled insanity while twenty have not addressed it); *cf.* [*Bieber v. People*, 856 P.2d 811, 817 (Colo.1993) ] (rejecting settled insanity as an unprincipled departure from the general rule precluding the insanity defense where defendant's psychotic state results from voluntary intoxication). Defendant tenders this as an appropriate case in which to recognize the doctrine, noting its general acceptance in other states, longevity under the common law, and recognition by the drafters of the Model Penal Code.

. . . . Whatever its merits, the doctrine of settled insanity was developed to address mental illness resulting from long-term substance abuse over many years, gradually leading to organic brain damage, and its justification is based on the humane recognition "that at some point a person's earlier voluntary decisions become morally remote." [JOSHUA DRESSLER, UNDERSTANDING CRIMINAL LAW § 24.05[B], at 330 (3d ed.2001) ].

(Footnotes omitted.) The *Sexton* court found it unnecessary to decide whether to adopt settled insanity as a defense to murder, because, even if it were accepted law, the defendant's drug usage for only two weeks prior to the murder would be insufficient to establish the defense. *Id.* at 1103–05.

■ We believe that the circumstances of Berry's case fall squarely within the doctrine of settled insanity. As previously discussed, there is no evidence that Berry was intoxicated at the time of the offense. Further, the evidence that Berry experienced psychotic symptoms at the time of the offense is without conflict, as is the

evidence that Berry's alcohol abuse was prolonged, habitual, and severe. Berry's mental disease was not temporary as evidenced by the fact that prison doctors have continued to prescribe psychiatric medicines such as lithium and Seroquel. As the doctrine of settled insanity is well established, having been set forth by our supreme court more than 125 years ago, our duty is to apply it where appropriate. *See Dragon v. State*, 774 N.E.2d 103, 107 (Ind.Ct.App.2002) ("We are bound by the decisions of our supreme court."), *trans. denied* 783 N.E.2d 687 (Ind.2003). *Fisher* represents longstanding precedent that is both unequivocal and thorough in its presentation, and any decision to overturn or modify such a precedent must originate from our supreme court or our legislature. *See id.* ("Supreme court precedent is binding upon us until it is changed either by that court or by legislative enactment."). As such, we conclude that Berry's psychosis resulting from prolonged, habitual, and severe alcohol abuse is a mental disease or defect within the meaning of Section 35–41–3–6(b).

However, a successful insanity defense must also satisfy the requirement of Section 35–41–3–6(a) that, as a result of the mental disease or defect, the person is unable to appreciate the wrongfulness of the conduct at the time of the offense. We turn now to this issue.

### C. Ability to Appreciate Wrongfulness of Conduct

■ Even though the trial court concluded that Berry was suffering psychotic symptoms on the morning of February 9, it found that Berry was able to appreciate the wrongfulness of his conduct based on his behavior before, during, and after the assault.[13] Appellant's Addendum to Br. at 15.

13. Although two experts determined that Berry did not appreciate the wrongfulness of his

Specifically, the trial court found as follows:

> [Berry's] own words and actions before, during, and after the assault, lead to the conclusion that [Berry] acted knowingly, that he intended to kill Tony Monday, and that he was aware of the wrongfulness of his actions. When he entered the bathroom where Tony was working, he told Tony that he was going to kill him, and when Tony asked him why, [Berry] told Tony to shut up and that he was going to kill him. He did not strike Tony once with the claw hammer. He beat him viciously a half dozen times about the head and face and admitted to his father and the police that he had hit Tony with the hammer. He told Dr. Masbaum that he was standing there with his father's hammer, that he panicked, and that he knew that he had hurt somebody. He recovered a towel, presumably from the bathroom, and proceeded to wipe the blood off of the hammer, was told to go to the garage with the hammer by his father, but instead walked around the side of the house, went to his father's truck parked in the street, and hid both hammer and bloody towel in a drawer of a chest of drawers (belonging to him) which was in the bed of the truck. He then locked himself in the garage and refused to come out until his father talked him into doing so. When questioned by the officers, he told them that the hammer was in the truck, and when the officers headed towards a truck parked in the back yard, [Berry] redirected them to his father's truck parked in front of the house.

*Id.* at 13.

We observe that

> as a general rule, demeanor evidence must be considered as a whole, in rela-

tion to all the other evidence. To allow otherwise would give carte blanche to the trier of fact and make appellate review virtually impossible. For instance, in *Thompson* [, 804 N.E.2d 1146] and [*Gambill v. State,* 675 N.E.2d 668 (Ind. 1996),] the trial courts found that the defendant's flight from police was probative of sanity. But in *Lyon v. State,* the fact that the defendant did not flee but rather waited for police in the next room was probative of sanity. 608 N.E.2d 1368, 1369–70 (Ind.1993). If a piece of demeanor evidence standing alone is considered probative, evidence of the defendant's actions after the crime could be used as the sole basis for a finding of sanity, whether the defendant cooperated with police or not.

*Galloway,* 938 N.E.2d at 714.

In *Galloway,* the court found that "there was not sufficient evidence of probative value from which an inference of sanity could be drawn sufficient to create a conflict with the (nonconflicting) expert testimony that the defendant was insane at the time of the offense." *Id.* The *Galloway* court reasoned that

> [t]he trial court based its findings on very little evidence. It found as probative of sanity the fact that, over the course of an hour, the defendant shopped, ate, and filled a car with gasoline without incident. It also found as probative the fact that the defendant cooperated with police after the fact. Viewed in isolation, each of these events may indeed represent the normal events of daily life. However, when viewed against the defendant's long history of mental illness with psychotic episodes, the defendant's demeanor during the crime, as testified to by three eyewit-

conduct and one expert was unable to make that determination, the trial court was not required to rely on unconflicting expert testimony. *See Galloway,* 938 N.E.2d at 709.

nesses, and the absence of any suggestions of feigning or malingering, this demeanor evidence is simply neutral and not probative of sanity.

*Id.* at 715.

■ Here, the conduct described by the trial court supports a reasonable inference that Berry knew what he was doing when he struck Tony with the hammer, but acting knowingly and intentionally is not synonymous with appreciating the wrongfulness of one's conduct. We observe that Berry and Tony did not know each other, and there is no explanation as to Berry's motive. On the other hand, Berry had a long history of hospitalization for bipolar disorder. Berry had begun the day reading the Bible, and he told the police that God told him to kill Tony. The police testified that Berry's answers to their questions were "nonsensical." Tr. at 232. Father testified that just after the attack, Berry was in a daze, pacing about. Berry wiped the hammer with a towel, but if he was trying to hide the blood, then why did he wrap the towel around the hammer rather than hide or discard it? The trial court emphasizes that Berry did not go immediately to the garage but first put the hammer in Father's truck. Given that Father told Berry to put the hammer away, the fact that Berry put the hammer in a drawer in the truck does not support a

reasonable inference that Berry was trying to hide the hammer. *Id.* at 165, 238–39. Although Berry did not go immediately to the garage, after he put the hammer away as directed, he came back into the house to ask Father where the garage was, and once he received the information, he obeyed. In addition, Berry did not hide the location of the hammer from the police but told them exactly where it was.

Considered as a whole, the demeanor evidence does not support a reasonable inference of sanity sufficient to create a conflict with the nonconflicting expert testimony that Berry did not appreciate the wrongfulness of his actions.[14] We conclude that the trial court erred in finding that Berry's conduct and statements before, during, and after the attack point to his knowledge of the wrongful nature of his actions. The evidence is without conflict and leads only to the conclusion that Berry was suffering from a mental disease or defect that rendered him unable to appreciate the wrongfulness of his actions at the time he attempted to kill Tony. Accordingly, the trial court erred in not finding Berry NRI. We reverse the trial court's judgment and remand with instructions to enter a finding of NRI and for further proceedings as required by the Indiana Code, such as the civil commit-

14. The trial court also found that Berry displayed a pattern of embellishment that it found was "all too close to what Dr. Masbaum described as malingering.'" Appellant's Addendum to Br. at 13. We observe that Dr. Masbaum did not testify that Berry was malingering. Rather, he testified as to behaviors that might indicate malingering, such as not being able to remember what happened at the time of a crime. Given that Berry admitted to Father and to police immediately after the offense that he hit Tony with the hammer and knew he was hitting him with the hammer, it is unreasonable to conclude that Berry displayed amnesia regarding his actions during the attack. As to embellishing, the trial court appears to be referring to Berry's statement that Father told him to put the hammer away. Berry did not tell Dr. Masbaum that Father told him to put the hammer away, but he related that information to Dr. Parker, so Dr. Masbaum thought that Berry was embellishing his account. Tr. at 405–06. However, Dr. Masbaum apparently did not know that Berry informed police that Father told him to put the hammer away immediately following the crime. Therefore, the statement that Father told him to put the hammer away was not something that Berry later added to his account.

ment proceedings discussed in footnote 6, *supra.* Reversed and remanded.

ROBB, C.J., and NAJAM, J., concur.