ATTORNEY FOR APPELLANT
Patricia Caress McMath
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Richard C. Webster
Deputy Attorney General
Indianapolis, Indiana



In the
Indiana Supreme Court

No. 49S04-1110-CR-611

JOHN BERRY,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Marion Superior Court, No. 49G22-0902-FA-024179
The Honorable Carol Orbison, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 49A04-1008-CR-536

**June 20, 2012**

**David, Justice.**

After a bench trial, the trial court rejected the defendant's insanity defense, finding that the defendant's behavior was the result of his voluntary abuse of alcohol. The Court of Appeals reversed, concluding that the defendant suffered from "settled insanity," a mental disease or defect caused by the defendant's prolonged and chronic abuse of alcohol, which rendered him unable to appreciate the wrongfulness of his conduct.

We affirm the trial court because there was credible expert testimony that defendant's behavior was caused by his voluntary abuse of alcohol.

**Facts and Procedural History**

John Berry is a forty-one-year-old man who suffers from alcohol dependence. Berry began abusing alcohol at the age of nine and became a daily drinker by his sophomore year of high school. He also used marijuana, cocaine, methamphetamine, LSD, mushrooms, and ecstasy, but he stopped using these drugs at age thirty. His drinking, however, continued.

Over the years, Berry has received rehabilitation treatment multiple times without success. He also has several convictions related to his alcohol use.

In 1999, Berry was diagnosed with bipolar disorder. He has been hospitalized multiple times for a combination of symptoms related to his drug and alcohol abuse and bipolar disorder. He has been treated with mood-stabilizing, psychotropic, antianxiety, and antidepressant medications.

On Monday, February 9, 2009, Berry went with his father, John Berry III (Father), to a house Father was helping renovate. Father parked his truck in front of the house. Tony Monday was working on the bathroom ceramic tile when Berry and Father arrived.

Father greeted Monday, and Monday told Father that he had borrowed the power drill and claw hammer during the weekend and that those tools were in the bathroom. Father then took Berry into one of the bedrooms where Berry was to do drywall work, and Father told Berry where the drill and hammer were.

Berry went into the bathroom and told Monday that he was "going to kill" him. Monday asked Berry why, and Berry told Monday to "shut up" and repeated that he was "going to kill" him. Berry then struck Monday in the head with the claw hammer. Monday pleaded with Berry to stop, but Berry ignored him and continued to strike Monday.

During this time, Father was in the living room area with his back to the hallway leading to the bathroom. Eventually, Monday exited the bathroom into the hallway, and Father turned around to see Monday bleeding profusely from his head. Father began attending to Monday's injuries as Monday explained to Father what happened. Father called 911.

Father then saw Berry in the kitchen, walking back and forth and wiping the hammer with a towel. Father asked Berry, "Did you hit him with the f**king hammer?" Berry responded, "I guess so."

Father told Berry to go to the garage. Berry left through the back door, walked to the front of the house, opened Father's truck, and placed the hammer and bloody towel in a chest of drawers located in the covered bed of the truck. Berry then reentered the house and told Father he could not find the garage. Father told Berry where the garage was and that Berry should stay there.

Medics and police officers arrived soon after. Father told the officers where Berry was, and they surrounded the garage. Berry initially refused to unlock the door and exit the garage, but Father was eventually able to convince Berry to come out.

Police handcuffed Berry and began to question him. They described Berry's behavior as nonchalant and very calm; noted that Berry's speech was clear; and stated that Berry offered no resistance. When asked where the hammer was, Berry told police it was in a drawer in the truck and directed them to the correct truck. When asked why he placed the hammer there, Berry responded that Father told him to do so. Finally, when asked why he hit Monday with the hammer, Berry gave nonsensical answers, including that God told him to hit Monday and that Monday was caught playing with an eagle. Berry was then taken to the hospital, admitted to a mental health center, and discharged several days later.

Monday suffered severe injuries. He underwent surgery to repair his nose, his eyes, and his broken jaw. Titanium plates were implanted into his skull, and he also lost sight in one eye. Monday can no longer use his dentures due to the damage inflicted to his jaw.

The State charged Berry with Class A felony attempted murder. Berry interposed an insanity defense. A court-appointed psychiatrist and court-appointed psychologist found Berry competent to stand trial.

Berry waived his right to a trial by jury. After hearing expert and lay testimony, the trial court found Berry guilty as charged, rejecting his insanity defense. On appeal, the Court of Appeals reversed, finding that "the circumstances of Berry's case fall squarely within the

doctrine of settled insanity." Berry v. State, 950 N.E.2d 821, 835 (Ind. Ct. App. 2011). We granted transfer.

## Insanity Defense

The issue before this Court is not whether the State failed to establish beyond a reasonable doubt the elements of attempted murder. See Ind. Code § 35-41-4-1(a) (2008). Rather, the issue is whether Berry successfully raised and established the insanity defense to avoid criminal responsibility. See id. § 35-41-3-6(a).

The burden is on the defendant to establish the defense of insanity by a preponderance of the evidence. Id. § 35-41-4-1(b). Specifically, a defendant has to prove that he could not appreciate the wrongfulness of his conduct at the time of the offense due to some mental disease or defect. Id. § 35-41-3-6(a). A "mental disease or defect" is defined as "a severely abnormal mental condition that grossly and demonstrably impairs a person's perception, but the term does not include an abnormality manifested only by repeated unlawful or antisocial conduct." Id. § 35-41-3-6(b).

When temporary mental incapacity is the result of voluntary intoxication, it does not fit within the above definition of "mental disease or defect." See Jackson v. State, 273 Ind. 49, 52, 402 N.E.2d 947, 949 (1980) ("Temporary mental incapacity, when induced by voluntary intoxication, normally furnishes no legal excuse for, or defense to, a crime.").[1] On the other hand, "[w]here the ingestion of intoxicants, though voluntary, has been abused to the point that it has produced mental disease such that the accused is unable to appreciate the wrongfulness of his conduct . . . the law does not hold him responsible for his acts." Id. at 52, 402 N.E.2d at 949.

---

[1] This has been codified. Indiana Code section 35-41-2-5 states that "[i]ntoxication is not a defense in a prosecution for an offense and may not be taken into consideration in determining the existence of a mental state that is an element of the offense unless the defendant meets the requirements of IC 35-41-3-5." Indiana Code section 35-41-3-5 states that intoxication is a defense only if the intoxication resulted from a substance being introduced (1) without the person's consent or (2) without the person's knowledge that the substance might cause intoxication.

4

A. *Standard of Review*

"A determination of insanity is a question for the trier of fact." Gambill v. State, 675 N.E.2d 668, 672 (Ind. 1996). Here, Berry claims that his insanity defense should have prevailed at trial; thus, he is in the position of appealing a negative judgment. See Metzler v. State, 540 N.E.2d 606, 610 (Ind. 1989). A defendant in Berry's position faces a "monumental burden" because he "seeks to upset the finding of the trier of fact on appeal." Lautzenheiser v. State, 481 N.E.2d 113, 114 (Ind. 1985).

The standard of review is highly deferential. A court on review does not reweigh evidence or assess witness credibility but rather considers only the evidence most favorable to the judgment and the reasonable and logical inferences drawn from that evidence. Thompson v. State, 804 N.E.2d 1146, 1149 (Ind. 2004). Importantly, a court on review asks whether the inferences supporting the trial court's judgment were reasonable and *not* whether "more reasonable" inferences could have been made. Id. at 1150 (internal quotation marks omitted).

Furthermore, in these circumstances, an appellate court reverses a trial court's judgment "only when the evidence is without conflict and leads only to the conclusion that the defendant was insane when the crime was committed." Id. at 1149. In Galloway v. State, this Court noted that "[t]he strongest showing of an evidentiary conflict occurs where the experts disagree as to whether the defendant was insane at the time of the offense." 938 N.E.2d 699, 710 (Ind. 2010). Thus, if a credible expert opines that a defendant was sane when committing an offense, despite other expert opinions to the contrary, it is reasonable for a trial court to reject a defendant's insanity defense. See id. ("[C]onflicting credible expert testimony is sufficiently probative of sanity.").[2]

B. *Intoxication and Mental Disease or Defect*

In this case, the trial court concluded that Berry did not meet either requirement for a successful insanity defense. Specifically, the trial court found that Berry did not suffer from a

---

[2] Also, a trial court can disregard the testimony of experts and instead rely upon the testimony of lay witnesses. Thompson, 804 N.E.2d at 1149.

mental disease or defect and that he appreciated the wrongful nature of his conduct. The trial court's conclusions were as follows:

> (1) The Defendant's conduct and statements before, during, and after the attack point to his knowledge of the wrongful nature of his actions.
>
> (2) The Defendant's conduct during the assault constituted a substantial step toward the commission of the intended crime of killing Tony Monday.
>
> (3) The psychotic symptoms displayed by the Defendant began during his alcohol binge on Saturday and Sunday and continued into the morning of the assault. Given the Defendant's longstanding and chronic alcoholism, coupled with his heavy drinking on the weekend preceding the assault on Monday morning, February 9, the Court concludes that these symptoms were brought on by the Defendant's voluntary abuse of alcohol, rather than the result of Bipolar Disorder or other mental disease or defect.

The Court of Appeals reversed, finding that the trial court erroneously rejected Berry's insanity defense. Berry, 950 N.E.2d at 837. On the issue of whether Berry suffered from a mental disease or defect, the Court of Appeals disagreed with the trial court's conclusions and determined that (1) there was no evidence from which a reasonable inference could be drawn that Berry was intoxicated at the time of the offense and that (2) Berry's psychotic state was a product of his "settled insanity." Id. at 832, 835.

The State argues that the Court of Appeals did not adhere to the applicable standard of review in this case. Specifically, the State claims that the Court of Appeals reweighed the evidence and assessed witness credibility. The State further argues that the Court of Appeals "sua sponte" found that Berry suffered from settled insanity even though no expert suggested that Berry suffered from such a condition.

Ultimately, we must decide the following issue: considering the evidence most favorable to the trial court's judgment, was it contrary to law for the trial court to conclude that Berry's psychotic symptoms were the result of his voluntary abuse of alcohol and not a mental disease or defect? This necessarily requires us to delve into the presented evidence and the fuzzy area of law on intoxication and insanity.

Three experts submitted reports and testified to Berry's mental status during the commission of the crime. Dr. Parker, a psychiatrist hired by the defense, was the first expert to

testify at trial. He met with Berry in September 2009. In Dr. Parker's report, he noted that "Berry said he drank a fifth of hard liquor daily for many years and freely admitted that he was an alcoholic." But Dr. Parker's ultimate conclusion was that "with reasonable medical certainty" during the time of the offense Berry suffered from a mental disorder, namely bipolar disorder, and accordingly did not appreciate the wrongfulness of his conduct. Dr. Parker elaborated on his conclusion,

> Mr. Berry meets criteria for diagnosis with bipolar disorder, most recent episode mixed, with psychotic features. . . . In the days prior to the assault, Mr. Berry started to experience visual hallucinations and delusions of an evil presence in his friend's house. His delusions and hallucinations continued upon his return to his father's house and he began to experience auditory hallucinations on the morning of the assault. . . . Mr. Berry was described by the ER psychiatrist as delusional, with a disorganized thought process, shortly after his arrest. All but one of the reports noted the defendant had used alcohol fairly heavily over the weekend preceding the assault, but had not been drinking heavily before then and had not consumed alcohol for nearly 24 hours at the time of the attack. It is therefore unlikely the defendant was intoxicated on alcohol at the time of the assault. It is also unlikely the defendant was experiencing delirium tremens . . . . In addition, the ER physician specifically stated the defendant was not experiencing delirium tremens.
>
> At the time of the clinical interview, the defendant had no memory of the assault itself. . . . Based on the defendant's active psychosis at the time of the assault, his attribution of the assault to an eagle (a symbol for God) and to God's message to him, and his lack of any attempt to flee the scene or destroy evidence, I believe the defendant did not appreciate the wrongfulness of his actions at the time of the alleged offense.

At trial, Dr. Parker stated, consistent with his report, that Berry met the requirements for a successful insanity defense because Berry was suffering from bipolar disorder, which had rendered him unable to appreciate the wrongfulness of his conduct at the time of the offense. Dr. Parker also opined that Berry was most likely sober when the incident occurred and that the psychosis was not related to alcohol use or withdrawal. He again noted that the emergency-room physician specifically stated that Berry was not suffering from delirium tremens at the time of the incident.

Dr. Olive, a court-appointed psychologist, testified after Dr. Parker. He met with Berry in May 2009. Dr. Olive's report referenced both Berry's bipolar disorder and the resulting inability to appreciate the wrongfulness of his conduct. Dr. Olive specifically stated as follows:

> With regard to his mental state at the time of the offense, in reviewing his narrative as well as the Probable Cause Affidavit, there appears to be evidence that Mr. Berry was unable to appreciate the wrongfulness of his conduct. Per the admission summary from Wishard Hospital from February 9, 2009, Mr. Berry appears to have been in the midst of a manic episode with psychotic features, as evidenced by persecutory delusions, derealization, and thoughts of control. Although the record from Wishard indicates that Mr. Berry might possibly had been in the midst of alcohol withdrawal, there is no evidence of delirium tremens, the latter of which might potentially account for some of his symptomatology. Thus, I am of the opinion that Mr. Berry's alleged conduct appears to be the direct product of the aforementioned symptomatology stemming from his Bipolar Disorder With Psychotic Features.

At trial, Dr. Olive testified consistent with his report, noting Berry's history of bipolar disorder and concluding that Berry could not appreciate the wrongfulness of his actions. Dr. Olive also stated that although he could not rule out alcohol definitively, he did not think that alcohol intoxication or withdrawal played a significant role. He further noted that there was no evidence that Berry was suffering from delirium tremens during the offense.

Dr. Masbaum, a court-appointed psychiatrist, was the last expert to testify. He met with Berry in April 2009. Dr. Masbaum's conclusions from his report differed from Dr. Parker's and Dr. Olive's conclusions. Specifically, Dr. Masbaum believed that voluntary alcohol abuse was the likely cause of Berry's symptoms:

> Due to this individual's history of a diagnosis and treatment of Bipolar Disorder as well as his history of alcohol withdrawal & Polysubstance use, it is difficult to determine with reasonable medical certainty whether he was of unsound mind and unable to appreciate the wrongfulness of his conduct at the time of the alleged offense. It is likely that his symptoms were a result of voluntary alcohol & substance use / intoxication / withdrawal or a combination of all. Based on my experience and training, violent behavior is more likely with the combination of alcohol & substances and a severe mental disorder rather than the disorder alone. His multiple hospitalizations gave him much opportunity to understand his disorder and the importance of taking his medication and the danger of using substances and alcohol with his disorder.

8

At trial, Dr. Masbaum was able to form more definite conclusions on Berry's condition at the time of the offense. Dr. Masbaum stated that "at the time of the alleged offense, it was my diagnostic impression there were four possibilities associated with the alcohol use at that time to explain [Berry's] symptoms and behavior." Dr. Masbaum named the four: alcohol intoxication, pathological intoxication, alcohol hallucinosis, and delirium tremens. Dr. Masbaum explained that the first three are "connected with voluntary alcohol use" whereas delirium tremens is "the only one to fall in the category of being a severe mental disorder." The trial court then asked Dr. Masbaum which of the four diagnostic possibilities outlined he would choose based on the course of Berry's treatment at the hospital after the incident and the manner in which Berry responded to the treatment. Dr. Masbaum responded, "Well, since [Berry] did not go into delirium tremens . . . then I believe one of the other three alcohol situations explain his symptoms and probably the first one, acute alcoholic intoxication, although the second also could be a factor." The trial court explored this issue further and asked Dr. Masbaum, "Did you, do you feel that absent delirium tremens that the patient could have been in alcohol withdrawal without any sign of D.T.?" Dr. Masbaum responded, "Yes. [Berry] could have had just a low grade type of withdrawal. There are all grades of it." The State then asked Dr. Masbaum, "So, basically, your diagnosis, the defendant placed himself in the alcohol-induced psychosis by voluntarily abusing alcohol; is that correct?" Dr. Masbaum responded, "Yes."

Dr. Masbaum also explained that Berry could have been intoxicated without showing any signs to that effect: "a person with chronic alcoholism can be drinking and not show any signs of intoxication outwardly whatsoever." Dr. Masbaum also explained that although Berry reported that he stopped drinking twenty-four hours before the attack, based on his clinical experience alcoholics are "not truthful" in reporting how much they drank. Dr Masbaum also made it clear that he believed that the bipolar diagnosis was "questionable" because there was "just too much alcohol awash here."

Several lay witnesses testified after the experts. Richard Lee Smith, a chemical dependency technician and Berry's Alcoholics Anonymous sponsor, testified to the various "stages" that Berry would go through when he drank. Specifically, Smith testified that Berry would first be intoxicated, then go through a withdrawal stage that would last two to three days,

9

proceed to a normal state, and finally become depressed.[3]  Cassandra Turner, who had been married to Berry, and Michelle Thompson, who had dated Berry, both testified to Berry's violent nature after he had been drinking.[4]

As stated earlier, temporary mental incapacity produced by voluntary intoxication is not an excuse for a crime.  Fisher v. State, 64 Ind. 435, 440, 1878 WL 3066, at *3.  In other words, that sort of temporary mental incapacity is not considered a mental disease or defect under Indiana's insanity statute.  On the other hand, Indiana recognizes situations where "the ingestion of intoxicants, though voluntary, has been abused to the point that it has produced mental disease."  Jackson, 273 Ind. at 52, 402 N.E.2d at 949.  This type of mental disease is now commonly referred to as "settled" or "fixed" insanity.  State v. Sexton, 904 A.2d 1092, 1101–04 (Vt. 2006) (citing numerous cases and other sources that have discussed the concept of "settled" or "fixed" insanity).  In cases where a defendant's conduct is caused by his or her "settled" or "fixed" insanity, the defendant would be able to meet the mental-disease prong of Indiana's insanity statute.

Here the experts disagreed as to what caused Berry's behavior.[5]  Both Dr. Parker and Dr. Olive attributed Berry's behavior to his bipolar disorder.  Dr. Masbaum, on the other hand, found that diagnosis questionable.  And at trial Dr. Masbaum opined that Berry's symptoms were

---

[3] According to the defense, the incident occurred more than twenty-four hours after Berry consumed alcohol; thus, the timing of the incident falls squarely within Berry's "withdrawal" phase as described by Smith.

[4] The trial court cited both Turner's and Thompson's testimony in its findings of fact:

> Outright violence on the part of the Defendant when he was drinking or in a withdrawal phase was reported by both his former wife and his girlfriend. Cassandra Turner, to whom he was married from 1991 to 1996, testified as to her personal experience with the Defendant's pattern of binge drinking, withdrawal and violence, as did Michelle Thompson who lived with the Defendant for five years, from 2000 to 2005.  In one incident reported by Ms. Thompson in March 2004, the Defendant broke into her apartment, apparently retrieved a hammer from a storage closet, and was found drinking in her kitchen, after having just been released from jail where he had spent the night sobering up following an arrest for public intoxication.

[5] In its findings, the trial court noted the conflict in the expert testimony.  Dr. Parker also acknowledged the conflict between himself and Dr. Masbaum: "[T]here's a relationship in time of alcohol use and the symptoms, but I don't think there's a cause, a cause and effect linkage between those two.  So, I'd respectfully disagree with Dr. Masbaum in that regard."

caused by the voluntary abuse of alcohol and not his bipolar disorder. Notably, none of the experts suggested that Berry suffered from "settled" or "fixed" insanity; in fact, all of the experts ruled out "delirium tremens," a type of settled insanity caused by the chronic abuse of alcohol. See Fisher, 64 Ind. at 440, 1878 WL 3066, at *3.

The intersection of voluntary intoxication and insanity is murky at best. Jeff Feix & Greg Wolber, Intoxication and Settled Insanity: A Finding of Not Guilty by Reason of Insanity, 35 J. Am. Acad. Psychiatry & Law 172–82 (2007) (describing the "complicated process of untangling the effects of mental illness and substance abuse" and noting that "the picture becomes more clouded" when substance abuse is involved in an insanity defense). Certainly, not all chronic alcoholics have destroyed their mental faculties to the point where they suffer from a mental disease as defined in Indiana's insanity statute. On the other hand, consumption of alcohol prior to committing an offense does not automatically rule out the insanity defense, as the underlying cause of a defendant's behavior could be a mental disease. Ultimately, it is for the trier of fact "to determine whether the accused's conduct was the result of a diseased mind—regardless of the source of the disease—or was the result of voluntary intoxication." Jackson, 273 Ind. at 52, 402 N.E.2d at 949.

Although we agree with the Court of Appeals that "settled insanity" is a mental disease or defect as defined in the insanity statute, we fail to see how the evidence was without conflict that Berry suffered from such a condition. As stated earlier, no expert suggested that settled insanity was the cause for Berry's behavior; in fact, all three experts ruled out delirium tremens, a form of settled insanity.

It is true that Dr. Masbaum could not give an exact label to Berry's condition.[6] But, in the end, Dr. Masbaum did opine that Berry's behavior was caused by his voluntary abuse of

---

[6] A specific label as to the defendant's state of mind is, in fact, unnecessary. This Court has specifically stated that triers of fact "need not be influenced by the use of specific labels, but rather must determine for themselves, whether the defendant's disability was such as to excuse him from criminal responsibility." Hill v. State, 252 Ind. 601, 616, 251 N.E.2d 429, 438 (1969).

> At bottom, the determination whether a man is or is not held responsible for his conduct is not a medical but a legal, social or moral judgment. Ideally, psychiatrists—much like experts in other fields—should provide grist for the legal mill, should furnish the raw data upon which the legal judgment is based. It is the psychiatrist who informs as to the mental state of the accused—his characteristics, his potentialities, his capabilities. But

11

alcohol. And the trial court, as the trier of fact, was within its province to accept Dr. Masbaum's testimony at trial, draw reasonable inferences from it, and discredit conflicting testimony. A reasonable inference from Dr. Masbaum's detailed testimony on the subject was that Berry's behavior was due to either voluntarily induced alcohol intoxication or voluntarily induced alcohol withdrawal. The subsequent lay testimony on Berry's post-intoxication behavior buttressed Dr. Masbaum's conclusions.[7] Given the highly deferential standard of review and the expert and lay testimony supporting the trial court's findings, we affirm the trial court.

---

> once this information is disclosed, it is society as a whole, represented by judge or jury, which decides whether a man with the characteristics described should or should not be held accountable for his acts.

Id. at 617, 251 N.E.2d at 438 (emphasis and internal quotation marks omitted) (quoting United States v. Freeman, 357 F.2d 606, 619–20 (2d Cir. 1966)).

[7] The trial court also made a finding on possible malingering by Berry based on Dr. Masbaum's testimony, which further supports a conclusion that Berry was not insane:

> On cross examination by the State, Dr. Masbaum found it significant that the Defendant was able to provide significant detail about what occurred before the assault and after the assault, but had little or no memory of the assault itself, although the Defendant did recall that after the assault on Tony, he was "standing there with my father's hammer . . . I started panicking . . . I knew I hurt somebody." Dr. Masbaum testified that it is common for a person arrested for a crime to report that they cannot remember what happened at the time of a crime. He stated that this is a form of malingering, which is faking mental illness to avoid criminal responsibility. The fact that a person experiences actual psychosis during an event does not, in many cases, prevent that person from remembering what occurred during the event. He also testified that a person who is in the mental health system for many years, hearing about and observing symptoms of different disorders reported by other patients, thereby developing a familiarity with the mental health system generally, learns to manipulate that system.

Accordingly, the trial court concluded on malingering as follows:

> The Defendant displayed a pattern of embellishment in the description of the hallucinations which he was experiencing on the morning of the assault during the succession of interviews which took place, beginning with the police on the scene and the treating psychiatrist at the hospital, followed by three psychiatric interviews. This pattern of embellishment, coupled with Defendant's amnesia regarding what occurred during the attack, is all too close to what Dr. Masbaum described as "malingering".

The Court of Appeals found it "unreasonable to conclude that Berry displayed amnesia regarding his actions during the attack." Berry, 950 N.E.2d at 837 n.14. However, the record, specifically Berry's statement given to police the day following the attack, references Berry's amnesia. The police asked, "Uh, you're saying, you said yesterday, that you had a blank spot as you described it." Berry responded, "Yeah."

Because the trial court appropriately found that Berry's conduct was not caused by a mental disease or defect, we need not address whether Berry could appreciate the wrongfulness of his conduct.

## Conclusion

There was credible expert testimony that Berry's behavior was caused by the voluntary abuse of alcohol and not a mental disease or defect as defined in Indiana's insanity statute. Accordingly, under the applicable standard of review, we affirm the trial court's rejection of Berry's insanity defense.

Dickson, C.J., and Sullivan, Rucker, and Massa, JJ., concur.