FILED

Sep 30 2016, 8:30 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Randy M. Fisher
Deputy Public Defender
Leonard, Hammond, Thoma & Terrill
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Karl Scharnberg
Deputy Attorney General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jason L. Bloomfield, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | September 30, 2016 <br><br> Court of Appeals Case No. <br> 02A05-1601-CR-112 <br><br> Appeal from the Allen Superior Court <br><br> The Honorable John F. Surbeck, Jr., Judge <br><br> Trial Court Cause No. <br> 02D06-1407-F5-4 |

**Crone, Judge.**

## Case Summary

[1] Jason L. Bloomfield appeals his convictions for two counts of level 5 felony battery of a public safety official resulting in bodily injury and one count of level 6 felony battery of a public safety official. He asserts that the evidence is

insufficient to support the jury's rejection of his insanity defense. We conclude that there was conflicting expert evidence as to whether Bloomfield was able to appreciate the wrongfulness of his actions at the time of the offenses and whether his mental state at the time of the offenses was the result of a mental disease or defect or voluntary intoxication. Thus, there was sufficient evidence for the jury to find that Bloomfield was legally sane when he committed the offenses. Accordingly, we affirm.

## Facts and Procedural History

[2] The evidence most favorable to the verdicts shows that in 2014, Bloomfield was regularly taking four to five Xanax pills and smoking Spice on a daily basis. On July 2, 2014, he took four to five Xanax pills and smoked Spice. On July 3, 2014, Bloomfield was booked into the Allen County Jail on charges unrelated to the current offenses. During the routine intake health screening, the nurse observed that Bloomfield had a gash across his nose, which had been inflicted by a nonlethal round or a bean bag earlier that day, and for which he had been taken to the emergency room prior to being brought to jail. Bloomfield told the intake nurse about his drug use and said that he was experiencing cold sweats. He was placed on observation for drug withdrawal and delirium tremens, and was housed in the jail block reserved for those who were being observed due to medical issues, drug withdrawal, suicide watch, or other reasons requiring close supervision.

[3] While incarcerated, Bloomfield was agitated, became progressively worse, and exhibited many bizarre behaviors. He was observed naked in his cell,

hallucinating, and trying to pick bugs off the wall. He drank out of the toilet. On July 5, he was taken to the hospital for "hallucinations and anxiety and spice withdrawal," but was returned to jail. Tr. at 174. On July 6, a nurse attempted to take his vital signs but was unable to because "he had erratic behavior … he was banging and kicking on the door and it just wasn't safe for him to be let out of his cell." *Id*. at 164.

[4] On July 7, Deputy Christopher Depew was conducting morning roll call. He opened the door to Bloomfield's cell, and Bloomfield rushed out, grabbed Deputy Depew's arm, and bit it. Bloomfield was completely naked. Deputy Depew called for backup on his lapel mike. Bloomfield grabbed the microphone and ripped it off. He began swinging the mike around by its cord and advanced toward Deputy Depew. Deputy Depew pushed Bloomfield to the ground, but Bloomfield got back up and came at the deputy. Deputy Depew realized that Bloomfield was not going to stop, so he retreated into the shower room and barricaded himself there until backup officers arrived.

[5] Deputies Chad Ray and Richard Wacasey responded to Deputy Depew's call for assistance. When they entered the block, Bloomfield was lying on the floor. He immediately jumped when he saw them and took up a fighting stance. Deputy Ray wrapped his arms around Bloomfield and took him to the ground. Deputy Ray tried to handcuff Bloomfield, but Bloomfield tried to bite Deputy Ray's hand. Deputy Ray pushed Bloomfield's head away, and Bloomfield grabbed Deputy Ray's testicles and began squeezing. Deputy Ray began yelling at Bloomfield and punching him. Other officers grabbed Bloomfield's hands,

put his hands behind his back, and handcuffed him. The officers then pulled him to his feet and carried him to a holding cell. Bloomfield continued to thrash about and try to bite the officers. After a restraint chair was brought into the holding cell, the officers began strapping Bloomfield in the chair. Deputy Richard Wacasey was controlling Bloomfield's head "to keep him from trying to bite anyone," when Bloomfield spit in his face. *Id*. at 120. Deputy Wacasey moved his head back, and Bloomfield spit at him again. Officers then placed a spit hood on Bloomfield.

[6] The State charged Bloomfield with two counts of level 5 felony battery of a public safety official resulting in bodily injury and one count of level 6 felony battery of a public safety official. Bloomfield filed his notice of intent to interpose defense of temporary insanity. The trial court appointed three doctors, Drs. David Lombard, Stephen Ross, and Kevin Wieland, to examine Bloomfield and determine his competency to stand trial and his sanity at the time he committed the offenses. All three doctors determined that Bloomfield was competent to stand trial.

[7] A three-day jury trial was held. Dr. Lombard testified that when he examined Bloomfield on September 2, 2014, he was "cognitively clear" and appeared to "understand everything that was going on." *Id*. at 353. Because Bloomfield told Dr. Lombard that he did not remember the events of July 7, 2014, Dr. Lombard testified that he was unable to form any opinion as to Bloomfield's state of mind during the attacks. However, Dr. Lombard testified that

Bloomfield's behaviors between July 3 and 7 were consistent with withdrawal from Xanax and Spice.

[8]     Dr. Ross testified that he examined Bloomfield on October 2, 2014. During the examination, Bloomfield was "anxious" but "he wasn't psychotic or aggressive." *Id*. at 423. Dr. Ross testified that Bloomfield's withdrawal from Xanax and Spice "precipitated the behaviors that led to these charges." *Id*. at 415. Dr. Ross concluded that the effects of withdrawal that Bloomfield had been suffering from on July 7 had been temporary. *Id*. at 423. Dr. Ross explained that withdrawal from Xanax can include "hyperactivity, tremors of the hand, insomnia, gastro and stomach problems, tactile hallucinations, … arbitrary hallucinations, illusions, agitation and anxiety," as well as seizures. *Id*. at 417. Dr. Ross opined that Bloomfield's "mental state or capacity to appreciate the wrongfulness of his behaviors was diminished principally due to his voluntary ingestion of mind altering substances and subsequent withdrawal." *Id*. at 420-21, 427. Dr. Ross also testified that Bloomfield's actions on July 7 could have stemmed from a psychotic episode, but "also could be in part volitional, something he's choosing to do because he's angry." *Id*. at 421-22. He testified that any psychosis would have been temporary. *Id*. at 423. Dr. Ross explained that if Bloomfield was acting of his own volition on July 7, it might indicate that he was able to appreciate the wrongfulness of his conduct. *Id*. at 422. Dr. Ross also opined that Bloomfield's withdrawal "compromised" his ability to control his anger. *Id*. Other than Bloomfield's substance abuse, Dr. Ross saw no indication of "an enduring or chronic

psychological condition." *Id.* Dr. Ross acknowledged that Bloomfield had been previously prescribed Geodon, an antipsychotic that is used "for those who are psychotic" and for those with "impulse control problems." *Id.* at 426.

[9] Dr. Wieland examined Bloomfield on December 19, 2014. Dr. Wieland testified that at the time of the attacks, Bloomfield was suffering from bipolar disorder with psychotic episodes and that he was "not completely sane." *Id.* at 389-90. However, Dr. Wieland testified that at the time of the examination, Bloomfield was not suffering from a manic or psychotic episode. *Id.* at 396. In addition, Dr. Wieland testified that withdrawal from "[il]licit drugs" could result in psychoses.[1] *Id.* at 390. When the prosecutor presented a hypothetical scenario reflecting Bloomfield's specific circumstances, Dr. Wieland acknowledged that such behaviors could have been caused by withdrawal from drugs. *Id.* at 394. Also, Dr. Wieland testified that Bloomfield had not accurately described his drug usage to him. Specifically, Dr. Wieland testified that Bloomfield did not tell him about his Xanax use and that Bloomfield told him that he had used marijuana occasionally but had not used it prior to being arrested. Dr. Wieland further testified that his conclusion that Bloomfield was "not completely sane" was based in part on the drug usage that Bloomfield had self-reported to him. *Id.* at 395.

---

[1] The State's suggestion that Bloomfield reported using methamphetamine is not supported by the record.

[10] The jury convicted Bloomfield as charged. The trial court sentenced Bloomfield to an aggregate sentence of eight and one-half years' incarceration, with seven years executed and eighteen months suspended to probation. This appeal ensued.

## Discussion and Decision

[11] Bloomfield argues that the evidence was insufficient to support the jury's rejection of his insanity defense. The insanity defense is an affirmative defense for which the defendant carries the burden of proof by a preponderance of the evidence. Ind. Code § 35-41-4-1(b). A defendant may be found not responsible by reason of insanity if the defendant establishes both that (1) he suffers from a mental disease or defect and (2) the mental disease or defect rendered the defendant unable to appreciate the wrongfulness of his conduct at the time of the offense. Ind. Code § 35-41-3-6(a); *Galloway v. State*, 938 N.E.2d 699, 708 (Ind. 2010). "'[M]ental disease or defect' means a severely abnormal mental condition that grossly and demonstrably impairs a person's perception, but the term does not include an abnormality manifested only by repeated unlawful or antisocial conduct." Ind. Code § 35-41-3-6(b). In addition, "[m]ental disease or defect, for purposes of the insanity statute, does *not* include temporary mental incapacity that results from voluntary intoxication." *Townsend v. State*, 45 N.E.3d 821, 828 (Ind. Ct. App. 2015), *trans. denied* (2016).[2]

---

[2] On a related note, Indiana Code Section 35-41-2-5 states that "[i]ntoxication is not a defense in a prosecution for an offense and may not be taken into consideration in determining the existence of a mental

[12] "'A determination of insanity is a question for the trier of fact.'" *Berry v. State*, 969 N.E.2d 35, 38 (Ind. 2012) (quoting *Gambill v. State*, 675 N.E.2d 668, 672 (Ind. 1996)). A defendant who claims that his insanity defense should have prevailed at trial appeals from a negative judgment, and "we will reverse only when the evidence is *without conflict* and leads only to the conclusion that the defendant was insane when the crime was committed." *Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004) (emphasis added). We will neither reweigh the evidence nor assess witness credibility but will consider "only the evidence most favorable to the judgment and the reasonable and logical inferences to be drawn therefrom." *Id.*

[13] Our supreme court has stated that "[t]he strongest showing of an evidentiary conflict occurs where the experts disagree as to whether the defendant was insane at the time of the offense." *Galloway*, 938 N.E.2d at 710. Therefore, where a credible expert opines that a defendant was sane when committing an offense, despite other expert opinions to the contrary, the evidence will support the trier of fact's rejection of a defendant's insanity defense. *See id.* ("[C]onflicting credible expert testimony is sufficiently probative of sanity."). Here, Bloomfield contends that the expert evidence is without conflict and leads only to the conclusion that he suffers from a mental disease or defect and that

---

state that is an element of the offense unless the defendant meets the requirements of IC 35-41-3-5." Indiana Code Section 35-41-3-5 states that intoxication is a defense only if the intoxication resulted from a substance being introduced (1) without the person's consent or (2) without the person's knowledge that the substance might cause intoxication. *See also Berry v. State*, 969 N.E.2d 35, 38 (Ind. 2012) ("'Temporary mental incapacity, when induced by voluntary intoxication, normally furnishes no legal excuse for, or defense to, a crime.'") (quoting *Jackson v. State*, 273 Ind. 49, 52, 402 N.E.2d 947, 949 (1980)).

the mental disease or defect rendered him unable to appreciate the wrongfulness of his conduct at the time of the offenses. According to Bloomfield, (1) Dr. Lombard did not give an opinion on his state of mind at the time of the offenses, (2) Dr. Wieland opined that he was suffering from bipolar disorder with psychotic episodes and could not appreciate the wrongfulness of his conduct at the time of the offenses, and (3) Dr. Ross satisfied both elements of the insanity defense in that he testified that he was aware that Bloomfield was previously prescribed Geodon (an antipsychotic drug) and that Bloomfield's ability to appreciate the wrongfulness of his actions was diminished at the time of the offense.

[14] We disagree with Bloomfield's characterization of Dr. Ross's testimony. As for Dr. Ross's knowledge that Bloomfield had previously been prescribed Geodon, we observe that Dr. Ross's awareness of the prescription does not mean that he agreed with the diagnosis made by the doctor who made the prescription. Further, the evidence in the record before us shows that Geodon may be prescribed for psychosis or impulse control, yet Bloomfield does not direct us to any evidence indicating whether he was prescribed Geodon for psychosis or impulse control. In addition, the fact that Bloomfield was previously prescribed Geodon for a certain condition does not necessarily mean that he was suffering from that condition at the time of the offenses. As for Dr. Ross's testimony that Bloomfield's ability to appreciate the wrongfulness of his actions was *diminished* at the time of the offenses, we observe that to prevail on an insanity defense, the defendant must prove that he or she was *unable* to appreciate the wrongfulness

of his or her conduct. A weakened ability to appreciate the wrongfulness of one's actions does not equate to an inability to appreciate the wrongfulness of one's actions. Simply put, Dr. Ross never testified that in his opinion Bloomfield was unable to appreciate the wrongfulness of his conduct.

[15] Significantly, Dr. Ross did *not* conclude that Bloomfield was suffering from bipolar disorder with psychotic episodes on July 7, which is contrary to Dr. Wieland's opinion. Rather, Dr. Ross testified that Bloomfield's withdrawal from Xanax and Spice precipitated his conduct on July 7 and that, other than Bloomfield's substance abuse, Dr. Ross saw no indication of an enduring or chronic psychological condition. Tr. at 414, 422. Also, Dr. Ross testified that Bloomfield's withdrawal compromised his ability to control his anger and he may have acted on his own volition because he was angry. *Id*. at 421-22. And Dr. Ross testified that if Bloomfield was acting volitionally, his conduct might indicate that he was able to appreciate the wrongfulness of his conduct. *Id*. at 422.

[16] Even though Dr. Ross specifically opined that Bloomfield's conduct was caused by his withdrawal from Xanax and Spice, Bloomfield argues that his conduct was not the result of voluntary intoxication but rather the result of "mental degeneration" caused by his long-term abuse of Xanax and Spice. Appellant's Br. at 19. Essentially, his argument is that even though he voluntarily used these drugs, his long-term use produced a mental disease for purposes of the insanity defense. In support, he cites *Berry*, in which our supreme court recognized that "'[w]here the ingestion of intoxicants, though voluntary, has

been abused to the point that it has produced mental disease such that the accused is unable to appreciate the wrongfulness of his conduct ... the law does not hold him responsible for his acts.'" 969 N.E.2d at 38 (quoting *Jackson v. State*, 273 Ind. 49, 52, 402 N.E.2d 947, 949 (1980). "This type of mental disease is now commonly referred to as 'settled' or 'fixed' insanity." *Id*. at 42 (quoting *State v. Sexton*, 180 Vt. 34, 904 A.2d 1092, 1101-04 (2006)). One type of "settled insanity" resulting from long-term alcohol abuse is delirium tremens, "a severe mental disorder." *Id*. at 41-42. In *Berry*, our supreme court considered whether the psychotic symptoms exhibited by the defendant at the time of his offenses were the result of bipolar disorder or intoxication from his voluntary use of alcohol. The defendant had a long history of chronic alcohol and drug abuse, but the court held that there was sufficient evidence that his behavior was the result of voluntary intoxication rather than delirium tremens. *Id*. at 44. In doing so, the court observed,

> The intersection of voluntary intoxication and insanity is murky at best. Certainly, not all chronic alcoholics have destroyed their mental faculties to the point where they suffer from a mental disease as defined in Indiana's insanity statute. On the other hand, consumption of alcohol prior to committing an offense does not automatically rule out the insanity defense, as the underlying cause of a defendant's behavior could be a mental disease. Ultimately, it is for the trier of fact to determine whether the accused's conduct was the result of a diseased mind–regardless of the source of the disease–or was the result of voluntary intoxication.

*Id*. at 43. (citations and quotation marks omitted).

[17] Here, Bloomfield was clearly suffering from the withdrawal of Xanax and Spice. Many long-term drug users become addicted and will experience some level of mental (and physical) anguish and/or incapacity during withdrawal from the abused drug. The painful withdrawal does not necessarily indicate that the long-term abuse of drugs caused a mental disease. The evidence shows that Bloomfield's last drug use was on July 2, 2014. He was incarcerated the next day. He was taken to the hospital on July 5, but apparently the medical staff believed that his withdrawal symptoms were not so severe as to require him to remain in the hospital, and he was returned to jail. Bloomfield was normal when he spoke to Dr. Lombard on September 2, 2014, to Dr. Wieland on December 19, 2014 and to Dr. Ross on October 2, 2014. None of the experts testified that Bloomfield's long-term drug use resulted in a mental disease. It is for the jury to determine whether the accused's conduct was the result of a diseased mind regardless of the source of the disease. *See id*. In this case, there was sufficient evidence from which the jury could reject Bloomfield's argument that his conduct was the result of a mental disease or defect. Thus, we are unpersuaded by Bloomfield's argument that the evidence is without conflict and leads only to the conclusion that Bloomfield was insane at the time of the offenses, and we affirm his convictions.

[18] Affirmed.

Kirsch, J., and May, J., concur.